**William I. KOCH, et al., Plaintiffs,**

**v.**

**KOCH INDUSTRIES, et al., Defendants.**

No. 85–1636–C.

United States District Court,
D. Kansas.

June 11, 1992.

Clifford L. Malone, Adams, Jones, Robinson & Malone, Harry L. Najim, Najim & Baker, Wichita, Kan., Ralph I. Miller, Frank L. Hill, Gregory S.C. Huffman, Dallas, Tex., Joseph F. Ryan, Lyne, Woodworth & Evarts, Boston, Mass., Abraham D. Sofaer, John M. Townsend, Norman C. Kleinberg, Michael E. Salzman, Hughes, Hubbard & Reed, Washington, D.C., Jerome G. Shapiro, Robert J. Sisk, Steven A. Hammond, Nicolas Swerdloff, Hughes, Hubbard & Reed, Russell E. Brooks, Milbank, Tweed, Hadley & McCloy, New York City, Stephen M. Joseph, Joseph, Robison & Anderson, P.A., Wichita, Kan., Michael Paul Kirschner, Hastie & Kirschner, Oklahoma City, Okl., for plaintiffs.

James M. Armstrong, Robert L. Howard, Foulston & Siefkin, Wichita, Kan., for defendants.

## MEMORANDUM AND ORDER

CROW, District Judge.

The case comes before the court on the defendants' motion to disqualify the law firm of Hughes, Hubbard & Reed ("HH & R") from representing any of the plaintiffs in this action. (Dk. 446). On January 27, 1992, HH & R entered its appearance in this case on behalf of the plaintiffs William I. Koch, Oxbow Energy, Inc., Spring Creek Art Foundation, and Northern Trust Co. (Dk. 416). On the same day, four members of HH & R firm, Abraham D. Sofaer, John M. Townsend, Norman C. Kleinberg, and Michael E. Salzman, moved for admission *pro hac vice.* (Dk. 417). The court granted these attorneys permission to practice before this court in their representation of the plaintiffs. (Dk. 442). HH & R opposes the defendants' motion to disqualify.

In their motion, defendants characterize HH & R's prior representation as "intimate" and wide-ranging involvement in defendants' affairs. HH & R's continued representation of plaintiff, in defendants' opinion, would constitute a "blatant breach" of HH & R's ethical duties of loyalty and confidentiality owed to them as former clients.

HH & R denies that its representation of certain plaintiffs in this suit is an ethical violation requiring disqualification. Specifically, HH & R maintains that KII could not reasonably expect in 1969 through sometime in 1976 that any information imparted to HH & R would be kept from William Koch who was serving then on the Board of Directors and as an officer in KII and several of its subsidiary corporations. Moreover, HH & R fails to see any substantial relationship between the present suit and the matters surrounding its representation of KII more than fifteen years ago.

An evidentiary hearing was held on May 20 and 21, 1992. The defendants presented the testimony of Donald Cordes. The plaintiffs called David Tillinghast, a former partner at HH & R and the supervising attorney or account executive of the legal work done for KII from 1972 through 1976. The parties agreed on nine pages of stipulations with fifteen exhibits in support. Additional exhibits were admitted at hearing.[1] Having heard the closing arguments and reviewed the parties' final written submissions, the court issues for the purpose of deciding this motion only its findings

---

1. The court also reserved rulings on several relevance objections to exhibits and certain opinion testimony. This order indicates the rulings now made through the court's reliance, if any, on this evidence in its findings of fact.

and conclusions as required by *Fullmer v. Harper*, 517 F.2d 20, 21–22 (10th Cir.1975).

## FINDINGS OF FACT

1. HH & R, a New York law firm, served as principal outside counsel to KII on various matters beginning in 1969 and continuing until sometime in 1976. Management for KII regularly contacted HH & R for legal advice on a wide array of subjects, including financing transactions, regulatory issues, maritime law, tax advice and planning, corporate reorganizations, stock recapitalization, and general corporate matters. HH & R delivered to KII at least thirteen transfer file cases of documents relating to HH & R's former representation of KII. While HH & R may not have been KII's only outside counsel during this period, the nature and scope of HH & R's representation suggests that HH & R functioned in many ways as general counsel to KII.

2. KII was, and continues to be, a privately held corporation with most shares owned by members of the Koch family. For this reason, HH & R's work required attention to the individual interests of the Koch family. In that regard, HH & R directly advised Charles Koch, David Koch, William Koch, and their mother, Mary Koch, on estate and tax planning matters, including the creation and maintenance of private charitable foundations.

3. After 1976, HH & R did not represent KII or any Koch family members until December of 1991, when it undertook its representation of William Koch and two corporate entities owned by him, Oxbow Energy, Inc. and Spring Creek Art Foundation, Inc., in this case. HH & R had no role in negotiating, drafting, or executing the Stock Purchase and Sale Agreement, dated June 4, 1983.

4. In October of 1982, William I. Koch and other shareholders filed an action against KII and its management alleging breach of fiduciary duties and fraud. This court was assigned the case. In connection with the settlement of that lawsuit in 1983, the parties entered into the Stock Purchase and Sale Agreement of June 4, 1983. By the terms of the settlement, the plaintiffs sold their shares of KII and dismissed the lawsuit. The present case was filed in June of 1985 by this group of selling shareholders, and they alleged their stock was sold at a price less than its true value because of fraudulent misrepresentations and misconduct and breaches of certain warranties contained within the stock sale agreement. The case was assigned also to this court. Over the seven-year history of this second case, the court has become quite familiar with the allegations and issues of the parties. After deciding several motions to amend and motions for review and in watching the discovery process, the court appreciates that the plaintiffs consider the allegations and issues relevant to their claims to encompass many more facts and circumstances than are alleged in the current second amended complaint (Dk. 180).

5. At least from 1969 and continuing past 1976, William Koch, Charles Koch, and David Koch were the largest shareholders of KII. William Koch was a member of KII's board of directors during this same period.

6. On November 4, 1988, William Koch filed an affidavit, Exhibit 16, in support of plaintiffs' motion to file a second amended complaint (Dk. 144). He avers therein that KII, at the direction of KII's management, in particular Charles Koch, engaged in unethical practices as early as the 1960s. For example, he avers that Charles Koch and KII fraudulently acquired the Atlas Petroleum stock of a Mr. Vosco resulting in an adverse judgment against KII. In the plaintiffs' proposed second amended complaint, plaintiffs refer to the Vosko litigation as evidence of a pattern of racketeering activity and allege that it was a "fraudulent scheme perpetrated by KII" and "conceived by defendant Charles Koch and participated in by defendants Varner and Carey." Even though the court denied plaintiffs' leave to include their RICO claim, Mr. Vosko's name appears on William Koch's witness list filed February 28, 1992. In its representation of KII, HH & R was in a position to acquire confidential

information relating to the Vosko litigation that is connected or related to the instant case.

(A portion of the order has been deleted as subject to the protective order.)

7. Also in his affidavit, William Koch avers that KII and Charles Koch by their attitudes and actions have disregarded the rights of minority shareholders. William Koch cites as one example the "force out" of minority shareholders in Great Northern Refining Company. Confidential information could have been imparted to HH & R about this transaction, as it gave legal advice to KII about the acquisition of minority interests in the successor company of Great Northern Refining.

(A portion of the order has been deleted as subject to the protective order.)

8. Again in his affidavit, William Koch asserts that there were ongoing criminal investigations of KII by the Internal Revenue Service ("IRS") from 1970 to 1980. HH & R was very much involved with a contested proceeding before the IRS in the early 1970s.

(A portion of the order has been deleted as subject to the protective order.)

9. In William Koch's affidavit at page four and in ¶ 67(c) of the plaintiffs' second amended complaint (Dk. 180), it is alleged that Charles Koch in March of 1980 misrepresented to William Koch that KII's exposure to the Department of Energy ("DOE") for fines was $1.2 billion. The complaint goes on to allege that no computer tape existed confirming this exposure, that Charles Koch knew there was no such exposure, and that the matter was eventually settled with the DOE for $14 million. HH & R represented KII in certain federal regulatory matters before the DOE and these matters appear to be related to the regulations and conduct upon which the fines were based.

(A portion of the order has been deleted as subject to the protective order.)

10. At ¶ 56(a) of their second amended complaint (Dk. 180), the plaintiffs allege that Charles Koch fraudulently misrepresented to William Koch in May and June of 1978 and again in October of 1979 the legal requirement for William Koch's charitable foundation to sell certain KII stock. The defendant Cordes allegedly advised Charles Koch that the applicable law required this sale. In its estate planning services for KII and the Koch family members, HH & R developed the original plan for creating and maintaining the charitable foundations.

(A portion of the order has been deleted as subject to the protective order.)

11. In the plaintiffs' memorandum in opposition (Dk. 70) to the defendants' motion to dismiss and for summary judgment, the plaintiffs alleged that they could not find on the 1982 and 1983 financial statements any disclosure of Koch Oil, S.A. or its asset value considering that "piles of funds" are on account for this foreign corporation. HH & R gave tax advice to KII regarding income received by Koch Oil, S.A.

(A portion of the order has been deleted as subject to the protective order.)

12. On January 31, 1992, the plaintiffs filed a motion to amend their second amended complaint (Dk. 419), for a second time. This pending motion seeks to add specific allegations on the wrongfulness of KII's accounting practices and policies. One of the exhibits submitted in support of the motion is a document that had been prepared in a financial transaction to which HH & R served KII as the principal legal counsel.

(A portion of the order has been deleted as subject to the protective order.)

13. Among the plaintiffs' proposed allegations on KII's misleading or fraudulent accounting practices is an attack on KII's practice of establishing and maintaining reserves for future or contingent liabilities. HH & R performed legal services for KII that could have revealed confidential information about KII's practices on contingent liabilities.

(A portion of the order has been deleted as subject to the protective order.)

14. A review of the stipulations, exhibits, and testimony leaves the strong impression that HH & R became privy to many of the inside workings of KII and to the long-

term wishes, desires and goals of the individual defendants. Beyond what is stated in these documents or is recalled on the witness stand, there is that intimate knowledge and familiarity which an attorney acquires of a client particularly during the course of an extended and general representation. The estate planning work done for Charles and David Koch put HH & R in a position to learn their priorities and plans for their own lives, as well as, their business.

(A portion of the order has been deleted as subject to the protective order.)

## CONCLUSIONS OF LAW

1. The standards for conduct of attorneys in this court are the Model Rules of Professional Conduct ("Model Rules") and the Code of Professional Responsibility ("Code") as adopted by the Supreme Court of Kansas. D.Kan. Rule 407. The Model Rules, in a modified form, are the standards effective March 1, 1988. 1991 Kan. Ct.R.Anno. Rule 226. The Code remains simply "as general statements of required professional conduct." 1991 Kan.Ct. R.Anno. Rule 226.

■■■ 2. Within the inherent supervisory powers of the court is the discretionary authority to control attorneys. *Redd v. Shell Oil Company*, 518 F.2d 311, 314 (10th Cir.1975). Consequently, motions to

disqualify counsel are committed to the court's sound discretion. *E.E.O.C. v. Orson H. Gygi Co. Inc.*, 749 F.2d 620, 621 (10th Cir.1984). In this district, the courts give these motions serious, conscientious, and conservative treatment. *Professional Service Industries, Inc. v. Kimbrell*, 758 F.Supp. 676, 680 (D.Kan.1991) (and cases cited therein). This approach serves a number of goals. The court reviews such a motion mindful that it can be used as a part of the litigation strategy, *Smith v. Whatcott*, 757 F.2d 1098, 1100 (10th Cir. 1985), or as a technique for harassing the other side, *Panduit Corp. v. All States Plastic Mfg. Co.*, 744 F.2d 1564, 1577 (Fed. Cir.1984). The court generally defers the issues of ethics to the appropriate disciplinary machinery except in those cases where the challenged conduct threatens to taint the process. *Ramsay v. Boeing Welfare Ben. Plans Committee*, 662 F.Supp. 968, 970 (D.Kan.1987). The court decides the motion on the facts peculiar to each case in an effort to balance carefully the interest of protecting the integrity of the process against the right of a party to the counsel of its choice.[2] *Id.*

■■ 3. The movant has the burden of showing the grounds for disqualification. *F.D.I.C. v. Sierra Resources, Inc.*, 682 F.Supp. 1167, 1170 (D.Colo.1987); *Field v. Freedman*, 527 F.Supp. 935, 941 (D.Kan. 1981).[3] The proof must be more than mere

---

**2.** The right to counsel of choice is an important one subject to override for compelling reasons. *Ramsay*, 662 F.Supp. at 970. Even so, this right is secondary in importance to preserving the integrity of the judicial process, maintaining the public confidence in the legal system and enforcing the ethical standards of professional conduct.

**3.** The defendants cite *Parker v. Volkswagenwerk Aktiengesellschaft*, 245 Kan. 580, 781 P.2d 1099 (1989), for authority that the burden of proof on a motion to disqualify is with the attorney or firm whose disqualification is being sought. Indeed, syllabus paragraph five to *Parker* states this very rule. However, the body of that opinion establishes the limited context for this rule. The facts in *Parker* required the Court to apply the imputed disqualification guideline in Rule 1.10(b) which addresses the situation where an attorney becomes associated with a new firm causing a conflict of interest. At page 587, 781 P.2d 1099 of *Parker*, the Court quoted, in part, the following from the Comment to Rule 1.10:

"Application of paragraphs (b) and (c) depends on a situation's particular facts. In any *such inquiry*, the burden of proof should rest upon the firm whose disqualification is sought."

Paragraphs (b) and (c) operate to disqualify the firm only when the lawyer involved has actual knowledge of information protected by Rules 1.6 and 1.9(b). (emphasis added).

Commentators have explained the reason for allocating the burden differently under Rule 1.10(b):

The text of the Rules of Professional Conduct are silent on this point, but the Comment states that the burden is on the incoming lawyer and members of the new firm to show that they should *not* be disciplined. In ruling on disqualification motions, however, most courts place the burden on those who are trying to *oust* the new firm to show that the matters are substantially related. But once that showing is made, the burden reverts to

speculation and must sustain a reasonable inference of a violation. *In re Blinder, Robinson & Co., Inc.*, 123 B.R. 900, 907–08 (Bankr.D.Colo.1991) (and cases cited therein). Because the interests to be protected are critical to the judicial system, doubts are resolved in favor of disqualification. *Id.* at 907; *see also Westinghouse Elec. Corp. v. Gulf Oil Corp.*, 588 F.2d 221, 225 (7th Cir.1978).[4]

■■■■ 4. An ethical violation does not automatically trigger disqualification. *Chapman Engineers v. Natural Gas Sales Co.*, 766 F.Supp. 949, 954 (D.Kan. 1991). Prophylactic conflict rules are enforceable also through disciplinary proceedings and civil remedies. *SWS Financial Fund v. Salomon Brothers Inc.*, 790 F.Supp. 1392 (N.D.Ill.1992). Because the adverse effect of disqualification is not limited to the attorney, the court should be satisfied that this blunt remedy serves the purposes behind the ethical rule in question. *Id.* Rule 1.9(a), however, directly states that disqualification is the suitable remedy.[5]

5. The defendants contend HH & R's representation of the plaintiffs violates Rule 1.9(a) and requires the imputed disqualification of HH & R under Rule 1.10(a). Rule 1.9 provides:

A lawyer who has formerly represented a client in a matter shall not thereafter:

(a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation; or

(b) use information relating to the representation to the disadvantage of the former client except as Rule 1.6 would permit with respect to a client or when the information has become generally known.

Rule 1.10(a) provides:

(a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7, 1.8(c), 1.9, or 2.2.

These Model Rules, as adopted and construed by the Kansas Supreme Court, control these proceedings. *Graham v. Wyeth Laboratories*, 906 F.2d 1419, 1422–23 (10th Cir.1990). In the absence of Kansas precedent, the court takes up the task of predicting what the Kansas courts would do.

6. Rule 1.9(a) proscribes the representation of interests adverse to a former client in the same or substantially related matters. The Comments to Rule 1.9 reveal that Rule 1.9(a) is without a counterpart in the Code but concerns ethical questions that were formerly addressed by Canon 9, avoiding the appearance of impropriety, and ethical consideration 4–6, preserving the client's confidences and secrets after acquired information protected by Rules 1.6 and 1.9(b). For these reasons, the court will give the movants the burden of proving a substantial relationship under Rule 1.9(a).

---

the firm to prove that the lawyer in question did *not* actually have relevant knowledge.

The reason for putting the burden on the firm is that it ordinarily has better access to the relevant evidence, specifically the individual lawyer's own testimony as to what he did and what he knew. The individual lawyer should be required to be forthcoming and persuasive.

1 Geoffrey C. Hazard, Jr. & W. William Hodes, *The Law of Lawyering*, § 1.10:209 (1990) (emphasis in original). In accordance with this commentary, the *Parker* court remanded the case and said the attorney or firm would have the burden of proving at the evidentiary hearing that he had not acquired confidential information about the matter while at his former firm. Unlike Rule 1.10(b), Rule 1.10(a), which is applicable here, imputes disqualification of the firm without a showing that the lawyer actually

**4.** "The dynamics of litigation are far too subtle, the attorney's role in that process is far too critical, and the public's interest in the outcome is far too great to leave room for even the slightest doubt concerning the ethical propriety of a lawyer's representation in a given case." *Emle Industries, Inc. v. Patentex, Inc.*, 478 F.2d 562, 571 (2nd Cir.1973).

**5.** Rule 1.9 provides: "A lawyer who has formerly represented a client in a matter *shall not* thereafter:

(a) *represent another person* in the same or substantially related matter...." (emphasis added).

the employment ended. Courts have identified several purposes behind Rule 1.9(a):

> It is a prophylactic rule to prevent even the potential that a former client's confidences and secrets may be used against him. Without such a rule, clients may be reluctant to confide completely in their attorneys. Second, the rule is important for the maintenance of public confidence in the integrity of the bar. (Citation omitted). Finally, and importantly, a client has a right to expect the loyalty of his attorney in the matter for which he is retained.

*In re Corn Derivatives Antitrust Litigation,* 748 F.2d 157, 162 (3rd Cir.1984), *cert. denied,* 472 U.S. 1008, 105 S.Ct. 2702, 86 L.Ed.2d 718 (1985); *see also Havens v. State of Ind.,* 793 F.2d 143, 145–46 (7th Cir.), *cert. denied,* 479 U.S. 935, 107 S.Ct. 411, 93 L.Ed.2d 363 (1986). Any interpretation and application of Rule 1.9(a) must either serve or, at least, be consistent with these multiple purposes.

7. Rule 1.9(a) was plainly intended to address in part an attorney's duty of loyalty in successive representation cases. Leading commentators have summarized the scope and purpose of Rule 1.9(a), as follows:

> Accordingly, Rule 1.9(a) prevents the disloyal act of switching sides in the same or a related matter, while Rule 1.9(c) [Rule 1.9(b) as adopted in Kansas] prevents use of information about a former client to his detriment. Put another way, subsection (a) extends the protections of Rule 1.7 to former clients, while subsection (c) [ (b) in Kansas] does the same for Rules 1.6 and 1.8(b).

1 Geoffrey C. Hazard, Jr. & W. William Hodes, *The Law of Lawyering* § 1.9:103 (1990) ("Hazard & Hodes"). The congruent purposes of Rules 1.7 and Rule 1.9 is re-

vealed in how the Model Rules were set up to address the duty of loyalty:

> Loyalty is an essential element in the lawyer's relationship to a client. An impermissible conflict of interest may exist before representation is undertaken, in which event the representation should be declined. If such a conflict arises after representation has been undertaken, the lawyer should withdraw from the representation. See Rule 1.16. *Where more than one client is involved and the lawyer withdraws because a conflict arises after representation, whether the lawyer may continue to represent any of the clients is determined by Rule 1.9.*

Comment to Rule 1.7 (emphasis added). A duty of loyalty in successive representation cases inheres in Rule 1.9(a).[6]

8. The movant's burden under Rule 1.9(a) is to show that:

> 1) the moving party and opposing counsel actually had a prior attorney client relationship; 2) the interests of the opposing counsel's present client are adverse to the movant; and 3) the matters involved in the present underlying lawsuit are substantially related to the matters for which the opposing counsel previously represented the moving party.

*Bieter Co. v. Blomquist,* 132 F.R.D. 220, 223 (D.Minn.1990) (citations omitted). The first two elements are undisputed in this case. HH & R represented KII from 1969 through sometime in 1976. The interests of HH & R's current clients, the plaintiffs, are obviously adverse to the interests of HH & R's former clients, the defendants. The focus of these proceedings is on the third element.

9. Rule 1.9(a) essentially codifies the common law rule applied in conflict of interest questions concerning former clients. The landmark decision of *T.C. Theatre Corp. v. Warner Brothers Pictures,*

---

**6.** The court in *SWS Financial Fund A,* contrary to the plaintiffs' reading, does not expressly rule out the duty of loyalty as a concern of Rule 1.9 The focus in that opinion is on the purposes of Rule 1.7, not Rule 1.9. This court does not attach much significance to the fact that the court in *SWS Financial Fund A* singled out the confidential information purpose of Rule 1.7

and said that it was shared with Rule 1.9 and then failed to mention that the loyalty purpose of Rule 1.7 was also shared with Rule 1.9. The plaintiffs' interpretation of that opinion pales against the Comments to Rule 1.7 and 1.9, the Seventh Circuit opinions, and the analysis in Hazard & Hodes.

113 F.Supp. 265, 268 (S.D.N.Y.1953) set forth the standard followed by most courts under the Code:

> [T]he former client need show no more than that the matters embraced within the pending suit wherein his former attorney appears on behalf of his adversary are substantially related to the matters or cause of action wherein the attorney previously represented him, the former client. The Court will assume that during the course of the former representation confidences were disclosed to the attorney bearing on the subject matter of the representation. It will not inquire into their nature and extent.

The case law affords an historic context for interpreting and applying the substantial relationship test in Rule 1.9(a).

10. Since *T.C. Theatre Corp.*, two distinct versions of the "substantially related" test have emerged. The first version, adopted by a majority of the courts, compares the "matters" or "factual contexts" of the prior and present representations. The Tenth Circuit has followed this majority rule. " ' "Substantiality is present if the factual contexts of the two representations are similar or related." ' " *Smith v. Whatcott*, 757 F.2d 1098, 1100 (10th Cir.1985) (quoting *Trust Corp. v. Piper Aircraft Corp.*, 701 F.2d 85, 87 (9th Cir.1983) (quoting *Trone v. Smith*, 621 F.2d 994, 998 (9th Cir.1980))). The second version, adopted by the Second Circuit, imposes a higher standard. A substantial relationship must be "patently clear" and requires disqualification "only when the issues involved have been 'identical' or 'essentially the same.' " *Government of India v. Cook Industries, Inc.*, 569 F.2d 737, 741 (2nd Cir.1978) (quoting in part *NCK Organization, Ltd. v. Bregman*, 542 F.2d 128, 135–36 (2nd Cir. 1976) (concurring opinion)). The difference between these two versions is with what is examined in the two representations—factual contexts versus issues—and with what is expected from the movant's proof—a similarity or relatedness versus "a patently clear" relationship.

11. This court posed to counsel the question whether Rule 1.9(a) adopts the Second Circuit's stricter version over the version followed by the majority of courts, including the Tenth Circuit. The reason for asking this question is that at least one writer has interpreted the Comment to Rule 1.9(a)[7] as adopting the Second Circuit's version.[8] After reading the counsels' responses and conducting its own research, the court believes the Tenth Circuit's traditional formulation of "substantially related" is still controlling in this district. Neither Rule 1.9(a) nor its comments[9] provide, in this court's judgment, a compelling cause for inferring that a single, stricter definition of substantial relationship was intended for Model Rules.[10] Moreover, the

7. Comment to Rule 1.9 reads in pertinent part: The scope of a "matter" for purposes of Rule 1.9(a) may depend on the facts of a particular situation or transaction. The lawyer's involvement in a matter can also be a question of degree. When a lawyer has been directly involved in a specific transaction, subsequent representation of other clients with materially adverse interests clearly is prohibited. On the other hand, a lawyer who recurrently handled a type of problem for a former client is not precluded from later representing another client in a wholly distinct problem of that type even though the subsequent representation involves a position adverse to the prior client.... *The underlying question is whether the lawyer was so involved in the matter that the subsequent representation can be justly regarded as a changing of sides in the matter in question.*
(Emphasis supplied).

8. Steven H. Goldberg, *The Former Client's Disqualification Gambit: A Bad Move in Pursuit of*

*An Ethical Anomaly*, 72 Minn.L.Rev. 227, 257 (1987) ("The commentary to Rule 1.9(a) suggests that the Second Circuit's patently clear test applies in determining whether matters are substantially related.")

9. The Kansas Supreme Court adopted in principle the Comments to the Model Rules so long as "they are not inconsistent with" the Model Rules, or the statutory or case law of Kansas. 1991 Kan.Ct.R.Anno. Rule 226.

10. The particular commentary, "whether the lawyer was so involved in the matter that the subsequent representation can be justly regarded as a changing of sides in the matter in question," is not the same as saying that the issues involved in the two representations are "identical or essentially the same." At most, the commentary suggests that the representations must be so closely connected that it can be reasonably said that the attorney switched sides or, in other words, breached the duty of loyalty.

Tenth Circuit in *Graham* said the term, "substantially related," had achieved "the status of a term of art in the general law of attorney conflicts of interest." 906 F.2d at 1422. The Tenth Circuit then quoted and applied in its enforcement of Rule 1.10(b) the definition of "substantially related" expressed in *Smith*. *Id.* The terms of Rule 1.9(a) and its accompanying Comments do not warrant a departure from Tenth Circuit precedent on the meaning of "substantially related."

12. The plaintiffs argued in their memoranda and at the hearing that the substantial relationship test was inapposite as the defendants could not reasonably expect that the information conveyed to HH & R would be kept from William Koch, who was then a director and officer of KII and, therefore, entitled by law to access to all material information relating to corporate operations and governance. This general rule comes from *Allegaert v. Perot*, 565 F.2d 246 (2nd Cir.1977).[11] The Second Circuit there held that the substantial relationship test was inapposite because the attorneys were not in a position during the previous representation whereby they could have received information which the former client might reasonably have assumed the attorneys would have withheld from the current clients. 565 F.2d at 250. In effect, *Allegaert* grafts another element onto the conflict of interest rule in successive representation cases where, in particular, "a partnership, joint venture or other cooperative effort breaks up, or where two former co-parties to a litigation later sue each other," *Keoseian v. Von Kaulbach*, 707 F.Supp. 150, 153 (S.D.N.Y.1989). The key common facts to *Allegaert* and its progeny is simultaneous representation of two clients with each aware of the other's relationship to the law firm and each without cause for believing its confidences would be withheld from the other. *American Special Risk Ins. v. Delta America Re Ins.*, 634 F.Supp. 112, 121 (S.D.N.Y.1986). The *Allegaert* rule has been extended even to circumstances where the representation of the former and current client was never simultaneous. *Id.; see, e.g., Christensen v. U.S. D. Court for Cent. D. of Cal.*, 844 F.2d 694, 698 (9th Cir.1988).

13. At the hearing, the court also posed to counsel the question whether the rule stated in *Allegaert* adequately serves each of the purposes to Rule 1.9(a). Though it believes the holding in *Allegaert* could be justified today under the Model Rules, the court seriously doubts whether the *Allegaert* rule, removed from its narrow factual underpinning, can be applied in harmony with Rule 1.9(a). As stated above, the prophylactic protection offered by Rule 1.9(a) extends beyond the preservation of confidential information. It also maintains public confidence in the system and, more importantly, safeguards a client's "right to expect the loyalty of his attorney...." *In re Corn Derivatives Antitrust Litigation*, 748 F.2d at 162. The Second Circuit in *Allegaert* was concerned only with an attorney's duty to preserve confidential information under Canon 4 and did not take up any appearance of impropriety or duty of loyalty that could be implicated by a conflict of interest problem in a successive representation case. 565 F.2d at 251 n. 7.[12] Indeed, the Fifth Circuit reached a different result under the Code, despite the apparent applicability of the *Allegaert* rule,

11. The Second Circuit in *Allegaert* heard an appeal challenging the denial of a motion to disqualify attorneys who had previously represented in a derivative action both the brokerage house and certain corporate clients. Prior to the joint venture between the brokerage house and the corporations, the attorneys for whom disqualification was sought had represented exclusively their corporate clients, and they continued their representation of these clients in the *Allegaert* case. The trustee for the now bankrupt brokerage house sought disqualification arguing the current suit against the brokerage house was substantially related to the derivative suit in which the same attorneys had jointly represented the corporate clients and the brokerage house.

12. The rationale to the *Allegaert* decision is that the purpose of the substantial relationship test is to protect only the former client's interest in confidential information. 565 F.2d at 250. Stated another way, the duty under Canon 4 to preserve the secrets and confidences of a client is not triggered if the *sine qua non*, confidential information, is not present.

by relying in part on these other ethical concerns:

> Information so acquired is sheltered from use by the attorney against his client by virtue of the attorney-client relationship. This is true without regard to whether someone else may be privy to it. (citation omitted). The obligation of an attorney not to misuse information acquired in the course of representation serves to vindicate the trust and reliance that clients place in their attorneys. A client would feel wronged if an opponent prevailed against him with the aid of an attorney who formerly represented the client in the same matter.... We recognize that this concern implicates the principle embodied in Canon 9 that attorneys "should avoid even the appearance of professional impropriety."

*Brennan's, Inc. v. Brennan's Restaurants, Inc.,* 590 F.2d 168, 172 (5th Cir. 1979);[13] *see Anchor Packing Co. v. Pro-Seal, Inc.,* 688 F.Supp. 1215, 1217–20 (E.D.Mich.1988); *St. Albans Financial Co. v. Blair,* 559 F.Supp. 523, 525–26 (E.D.Pa.), *aff'd,* 725 F.2d 670 (3rd Cir.1983). The court is convinced that the *Allegaert* rule fails to account for an important aspect of Rule 1.9(a), that is, an attorney owes to a former client a duty of loyalty which is breached when the attorney switches sides and begins representing an adverse interest in matters substantially related to the former representation. If the *Allegaert*

rule were applied to the instant case as argued by HH & R, then any duty of loyalty that HH & R owes to KII and other defendants would go unprotected. Simply put, the rationale of *Allegaert* does not encompass the scope of Rule 1.9(a). *See G.F. Industries, Inc. v. American Brands, Inc.,* 245 N.J.Super. 8, 11, 583 A.2d 765 (1990). Finally, Rule 1.9(a), by its terms, is not limited to situations where the former client would be harmed by the possible divulgence of confidential information. It imposes an ethical obligation irrespective of harm, *Richards v. Badaracco,* No. 88–836, 1988 WL 147152, 1988 U.S. Dist. LEXIS 15495 (D.N.J. June 27, 1988), or evidentiary privileges, *Bobkoski v. Board of Education of Cary,* No. 90–C–5737, 1991 WL 140150, 1991 U.S. Dist. LEXIS 10083 (July 23, 1991).[14]

14. Even assuming the court were to recognize the *Allegaert* rule, this court believes it is distinguishable on its facts. The Second Circuit explained its holding:

> Integral to our conclusion that ... [the attorneys] were not positioned to receive information intended to be withheld from ... [corporate clients] is the law firms' continuous and unbroken legal relationship with their primary clients. In contrast with our earlier cases, the attorneys sought to be disqualified here have not changed sides from a former client to a current, adverse client.

**13.** In *Brennan's,* a dispute between family members resulted in the stock of the private, closely-held corporations comprising the family business to be divided between two family groups. After the division, the general counsel to the family business continued his representation as to one of the family groups and ended his relationship with the other. In a subsequent suit between the family groups, it was argued that the general counsel need not be disqualified for there was no room for a presumption that the general counsel gained confidences that were kept from either family group. The Fifth Circuit rejected this argument and the narrow reading of Canon 4 upon which it is based. 590 F.2d at 170–72.

**14.** In its most recent brief, HH & R has cited *Franklin Savings Assoc. v. Office of Thrift Supervision,* No. 90–4054–S (D.Kan. May 31, 1990), in which the magistrate judge cited the rule from *Allegaert* as one of several reasons for denying

the motion to disqualify. Because none of the above arguments or issues are addressed in this decision, the court does not consider it persuasive authority. Neither side has cited the recent decision of *City of Hutchinson v. Gilmore,* 16 Kan.App.2d 646, 827 P.2d 784 (1992). The court would expect that HH & R would construe this decision broadly as holding that the switching of sides creates a conflict of interest under Rule 1.9(a) only if confidential or privileged information was exchanged in the prior relationship. *Gilmore,* however, stands for a much narrower proposition. In a case where it is not clear that the attorney formerly represented a criminal defendant, Rule 1.9(a) may still be violated if the defendant can be considered a client under the privilege and confidentiality rules. 16 Kan. App.2d at 649, 827 P.2d 784. Since the former attorney-client relationship between HH & R and KII is uncontested, the teachings in *Gilmore* are inapposite.

*Allegaert,* 565 F.2d at 251. These "integral" circumstances cannot be found in the present case. The application of *Allegaert* would not further a "continuous and unbroken legal relationship" between HH & R and its "primary client." 565 F.2d at 251. In fact, KII was the primary client of HH & R during the years of 1969 through 1976. Consequently, this is not a case where the attorneys sought to be disqualified have represented consistently a primary client and only occasionally a secondary client in some joint interest and now the former secondary client moves to disqualify the attorney. Unlike the law firms in *Allegaert,* HH & R switched sides and now represents interests adverse to its former primary client.[15] In this court's judgment, these distinctions are significant in showing that the duty of loyalty, while not at issue in *Allegaert,* is plainly implicated here. The *Allegaert* rule does not make the substantial relationship inapposite to this case.

■■■■ 15. In determining whether a substantial relationship exists, the court evaluates the similarities between the factual bases of the two representations. A commonality of legal claims or issues is not required. *In re Blinder, Robinson & Co., Inc.,* 123 B.R. at 909. At a functional level, the inquiry is whether "the attorneys were trying to acquire information vitally related to the subject matter of the pending litigation." *Trone v. Smith,* 621 F.2d 994, 1000 (9th Cir.1980).[16] To accomplish this inquiry, the court must be able to reconstruct

the attorney's representation of the former client, to infer what confidential information could have been imparted in that representation, and to decide whether that information has any relevance to the attorney's representation of the current client. *See LaSalle Nat. Bank v. County of Lake,* 703 F.2d 252, 255–56 (7th Cir.1983). What confidential information could have been imparted involves considering what information and facts ought to have been or would typically be disclosed in such a relationship. *Kaminski Bros., Inc. v. Detroit Diesel Allison,* 638 F.Supp. 414, 417 (M.D.Pa.1985). Consequently, the representations are substantially related if they involve the same client and the matters or transactions in question are relevantly interconnected or reveal the client's pattern of conduct. Hazard & Hodes, § 1.9:104.

■■■■ 16. If a substantial relationship is found, an irrebuttable presumption arises that the former client revealed facts requiring the attorney's disqualification. *Smith,* 757 F.2d at 1100. The court need not inquire into whether the confidential information was actually revealed or whether the attorney would be likely to use the information to the disadvantage of the former client. *Green v. Montgomery County, Ala.,* 784 F.Supp. 841, 844 (M.D.Ala.1992); *Carlson v. Langdon,* 751 P.2d 344, 348 (Wyo.1988). To conduct such an inquiry would frustrate the former client's interest in the confidential information. *Emle Industries Inc. v. Patentex, Inc.,* 478 F.2d 562, 571 (2nd Cir.1973).[17]

---

**15.** Plaintiffs' counsel argued at the evidentiary hearing that the Ninth Circuit's decision in *Christensen* showed that *Allegaert* should be applied even if the attorneys to be disqualified had switched sides. Though the Ninth Circuit did say that simultaneous representation was not a prerequisite to the *Allegaert* rule, it never addressed the circumstance of the attorney switching sides. If anything, the Ninth Circuit agreed with *Allegaert* that it was important or integral that the attorney not be perceived as switching sides but be seen as continuing the representation of its primary client:

The facts here are very similar. Wyman [the law firm for whom disqualification was sought] originally represented a management group that took over a corporation that later went bankrupt and then attempted to contin-

ue representation of their original client in litigation with the corporation.
844 F.2d at 698.

**16.** "Stated another way, the lawyer could have obtained confidential information in the first representation that would have been relevant in the second." *Analytica, Inc. v. NPD Research, Inc.,* 708 F.2d 1263, 1266 (7th Cir.1983).

**17.** The Second Circuit there observed:
Such an inquiry would prove destructive of the weighty policy considerations that serve as the pillars of Canon 4 of the Code, for the client's ultimate and compelled response to an attorney's claim of non-access would necessarily be to describe in detail the confidential information previously disclosed and now sought to be preserved. Thus, where "it can

Doubts as to whether a substantial relationship exists should be resolved in favor of disqualification. *See Westinghouse Elec. Corp. v. Gulf Oil Corp.*, 588 F.2d at 225.

17. HH & R insists the second amended complaint (Dk. 180), as amended (Dk. 438), should be the sole source of what the court considers to be the matters involved in the present lawsuit. Specifically, HH & R disputes that the allegations found in the plaintiff William Koch's affidavit (Ex. 16 to Dk. 14), in the plaintiffs' proposed second amended complaint (Dk. 144), or any of the plaintiffs' proposed pleadings or other memoranda have any relevance to the scope of HH & R's current representation. The court agrees the general rule is that the relevance of information gained from the former representation is judged against the allegations in the complaint. On the other hand, none of the cases cited by the plaintiffs held that relevance should not be assessed from what has been alleged also in the proposed complaints, affidavits filed in support of them, or other pertinent pleadings.[18] These cases, instead, emphasize that relevance is gauged from not only what can be gleaned from the complaints but also from what can be viewed as the nature of the evidence useful or helpful in proving those allegations. *See, e.g. Trone v. Smith*, 621 F.2d at 1000; *Westinghouse Elec. Corp. v. Gulf Oil Corp.*, 588 F.2d at 226. The pleadings to date establish that the scope of what evidence the plaintiffs consider relevant to their case is quite broad. The second amended complaint itself contains a number of allegations that could be seen as a way to offer a wide range of evidence on the defendants' carrying out a "scheme and artifice to defraud and overreach" minority shareholders, on the plaintiffs' diligence in selling their shares and in bringing this suit in light of what false information allegedly was disseminated by KII "over a number of years," and on the defendants' practice of governing KII in a way that the plaintiff shareholders could not know the actual operations of KII or the true value of their ownership interest. In addition, the claims and theories of this case makes the credibility of the principals a central issue. Consequently, the plaintiffs may attempt to use some of the facts from their proposed claims to impeach or discredit the defendants' case.[19] As this case has been pending since 1985, this court has had more than one occasion to become familiar with what the parties consider to be their respective claims and theories. *See, e.g., Koch v. Koch Industries*, 127 F.R.D. 206, 211–12 (D.Kan.1989) ("From the circumstances of the present case, the court reasonably infers plaintiffs' effort to have this court entertain 'theories seriatim' which would permit them to fulfill their apparent wish of conducting open-ended discovery of Koch Industries' business practices for the last twenty years.") For all of these reasons, the court rejects the plaintiffs' effort to set the parameters of HH & R's current

reasonably be said that in the course of the former representation the attorney *might* have acquired information related to the subject matter of his subsequent representation," *T.C. Theatre Corp., supra*, at 269, (emphasis supplied), it is the court's duty to order the attorney disqualified. Nowhere is Shakespeare's observation that "there is nothing either good or bad but thinking makes it so," more apt than in the realm of ethical considerations.
478 F.2d at 562.

**18.** While the law of the case doctrine could be used to deny a motion to reconsider the court's earlier rulings on the plaintiffs' motions to amend, those rulings are still interlocutory and subject to amendment or modification until final judgment is entered. *Major v. Benton*, 647 F.2d 110, 112 (10th Cir.1981). Presumably, the plaintiffs still believe their proposed claims, which were denied the required leave to amend, have some merit, and they will expect HH & R to continue their effort to persuade the court with new evidence and new arguments. Rather than speculating on the chances of its prior rulings being changed anytime soon or overturned on appeal, the court believes the more prudent course would be to consider the claims and allegations from the proposed pleadings and accompanying exhibits. Since it was the plaintiffs' decision to propose these pleadings, the court believes it fair to hold plaintiffs accountable for the consequences of doing so.

**19.** Along the same line, the defendants may attempt to use the plaintiffs' proposed allegations and supporting affidavits for impeachment purposes.

representation by what is strictly alleged in the second amended complaint. In keeping with the general spirit that any doubts should be resolved in favor of disqualification, the court will consider what was and is alleged in proposed pleadings, memoranda and affidavits, and what has been the subject of discovery.

18. HH & R functioned as general counsel to KII; its representation was not limited to a particular area or business aspect of KII. Rather, HH & R gave advice to KII through its executives and key owners on a wide variety of problems and issues. The length and breadth of HH & R's representation evinces the reasonable likelihood that HH & R was in a position to learn confidential information relevant to this case. *See In re Blinder, Robinson & Co., Inc.*, 123 B.R. at 909–10 (and cases cited therein).

19. Before their current defense against the motion to disqualify, plaintiffs have been less than willing to concede a definite temporal scope to their claims. For that matter, not until recently have the plaintiffs said the focus of their claims is with the written warranties in the 1983 Stock Purchase and Sale Agreement rather than some far-reaching allegations of fraud. At nearly every turn in this case for the last seven years, the magistrate judge and the district judge have heard arguments from plaintiff that their claims are far more than what the court has been able to read from their pleadings. Because of the plaintiffs' wide-ranging allegations of schemes, fraud and concealment in not only their complaint but in their proposed claims, affidavits and memoranda, the court expects that the plaintiffs' will attempt to prove their claims with evidence of an even wider range. To overcome the anticipated defense that they knew or had reason to know of KII's business practices during the period from 1980 to 1983, plaintiffs repeatedly have painted the defendants as spinning a web of deception that prevented them from discovering the truth. In other words, the court believes the plaintiffs consider one of the central themes of their case to be that the defendants have engaged in a pattern of fraudulent conduct over an extended period of time, beginning in the early 1970s and continuing at least until the plaintiffs sold their shares, in order to conceal their wrongdoings, to maintain their control of KII, and, in turn, to prevent KII from going public. The plaintiffs' far-reaching allegations of fraud and broad attacks on the personal motives of the individual defendants makes HH & R's general knowledge of KII and its top personnel, as well as, its legal background work for KII relevant to this case. *See U.S. Football League v. National Football League*, 605 F.Supp. 1448, 1460 (S.D.N.Y. 1985); Restatement (Third) Law Governing Lawyers (Tentative Draft No. 4) § 213 cmt. d, illus. 3.

20. The court's detailed findings establish the substantial relationship between HH & R's former representation of KII in numerous matters and its current representation of the plaintiffs in this case. Contrary to plaintiffs' assertions, these findings constitute much more than "superficial similarities, allusions or semantics." They, instead, evince a significant nexus between several events and transactions encompassed in the plaintiffs' broad allegations and what was entailed in HH & R's extended representation of KII. Moreover, the findings adequately reveal that HH & R served KII in such capacities that it could have received confidential information which would be relevant in the case *sub judice*. In these circumstances, the court is justified in imposing the irrebuttable presumption that KII and certain individual defendants revealed facts requiring HH & R's disqualification. No additional inquiry is necessary as to whether confidential information was actually imparted or whether HH & R would be likely to use this information to the disadvantage of the defendants.

21. Disqualification of HH & R from any further representation of the plaintiffs in this case is the appropriate remedy under the terms of Rules 1.9(a) and 1.10(a). HH & R's continued representation of the plaintiffs carries a threat of tainting the trial or compromising the integrity of the adversarial process. Because the insight

and knowledge gained through its former representation of gives HH & R a material advantage in prosecuting the plaintiffs' claims, the playing field is now tilted. The competing factors do not overcome the need for disqualification. The plaintiffs are not severely or unfairly prejudiced by the disqualification of HH & R. The firm entered its appearance for the plaintiffs only a few months ago in this seven year old case. HH & R is not the only firm that has appeared for the plaintiffs. At least ten other law firms have done so. Several firms and their local counsel still represent the plaintiffs and are unaffected by the motion to disqualify. Plaintiffs' discovery was essentially completed by these other counsel. The trust and the financial investment that plaintiffs may have in HH & R are certainly considerations, but they simply do not outweigh the need for disqualification. As has been displayed in the last seven years, the plaintiffs have the financial means to hire more competent counsel who can serve them adequately at trial.

22. HH & R avers that it has erected a Chinese Wall to ensure that none of its attorneys working on the plaintiffs' case receive information obtained during its representation of KII. In two recent decisions, the Kansas Supreme Court interpreted the Model Rules as rejecting any notion that screening devices, such as the Chinese Wall, can prevent the imputed disqualification of firms under Rule 1.10. *Lansing–Delaware Water District v. Oak Lane Park, Inc.*, 248 Kan. 563, 573–74, 808 P.2d 1369 (1991); *Parker v. Volkswagenwerk Aktiengesellschaft*, 245 Kan. 580, 589, 781 P.2d 1099 (1989) (citing 1 Hazard and Hodes, The Law of Lawyering: A Handbook on the Model Rules of Professional Conduct, Rule 1.10, p. 191 (1988 Supp.)). Kansas case law construing the Model Rules is controlling. *Graham v. Wyeth Laboratories*, 906 F.2d at 1423. HH & R's implementation of the Chinese Wall does not avert its disqualification.

IT IS THEREFORE ORDERED that the defendants' motion to disqualify (Dk. 446) HH & R from representing any of the plaintiffs in this action is granted.