Americo R. PRISCO, et al., Plaintiffs,

v.

**WESTGATE ENTERTAINMENT, INC.,**
**formerly known as Westgate**
**Productions, Inc., Defendant.**

Civ. No. B–88–378 (WWE).

United States District Court,
D. Connecticut.

Aug. 17, 1992.

---

Stephen J. Conover, Robert A. Slavitt, Paul R. Kraus, Slavitt, Connery & Vardamis, Norwalk, Conn., for plaintiffs.

Shelley R. Sadin, Dominick C. Esposito, William C. Longa, Zeldes, Needle & Cooper A Professional Corp., Bridgeport, Conn., for defendant.

## RULING ON MOTION TO DISQUALIFY COUNSEL

EGINTON, District Judge.

Defendant Westgate Entertainment ["Westgate"] moves, pursuant to Local Rules 3(a) and 33 and Rule 1.9 of the Model Rules of Professional Conduct, to disqualify the law firm of Slavitt, Connery & Vardamis ["Slavitt, Connery"] from representing or assisting the plaintiffs in this case. Motion papers reveal the following facts.

In August, 1987 a limited partnership named Titanic Ventures [the "Partnership"] was created to explore the wreck of the ocean liner Titanic and prepare a television program detailing the exploration. Plaintiffs were among the limited partners in the Partnership, and were entrusted with the task of raising funds for the exploration phase of the project. The Partnership had two general partners. General partner Westgate was entrusted with the task of raising funds for production of the television program. The plaintiffs and the remaining limited partners had a controlling interest in the second general partner, Oceanic Research and Exploration, Ltd. ["Oceanic"].

At the time the Partnership was formed, Westgate assigned to the Partnership all of its rights and obligations contained in an agreement between Westgate and LBS Industries, Inc. ["LBS"] concerning promotion and marketing of the Titanic exploration. In the fall of 1987, disputes arose between Westgate and the limited partners over Westgate's obligations under the Partnership agreement. On January 13, 1988, the limited partners voted to remove Westgate and Oceanic as general partners.

It is undisputed that Slavitt, Connery through its partner, Robert A. Slavitt, played the following roles in relation to the Partnership. Robert Slavitt was retained by George Tulloch, a limited partner and principal of Oceanic, to be general counsel to the Partnership, a role he held throughout the above-referenced events. Robert Slavitt drafted both the original Partnership agreement and the agreement governing the LBS assignment from Westgate to the Partnership. In addition, Robert Slavitt chaired the meeting of January 13, 1988 where Westgate was removed as a general partner. This litigation arises out of alleged breaches of the Partnership agreement and the LBS assignment.

Westgate bases its motion on two arguments. First, that because Robert Slavitt was general counsel to a partnership in which Westgate was a general partner, he and his firm should now be prohibited by Rule 1.9 of the Rules of Professional Conduct from opposing Westgate in this litigation. Second, that since Robert Slavitt participated in Partnership business and disputes, he and his firm should be disqualified pursuant to Local Rule 33 because it is likely he will be called as a witness in this case. For the following reasons, defendant Westgate Entertainment's motion to disqualify the law firm of Slavitt, Connery and Vardamis will be granted.

## DISCUSSION

■ Under Local Rule 3(a)(1), the standards for attorney conduct in this District are set by the Rules of Professional Conduct as approved by the Judges of the Connecticut Superior Court. Rule 1.9 of

the Rules of Professional Conduct provides:

> A lawyer who has formerly represented a client in a matter shall not thereafter:
>
> > (a) Represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation
> >
> > . . . .

Model Rules of Professional Conduct Rule 1.9 (1983). Westgate's burden under Rule 1.9 is to show that: 1) Slavitt, Connery and Westgate actually had a prior attorney client relationship; 2) the interests of Slavitt, Connery's current client are adverse to those of Westgate; and 3) the matters involved in the instant case are substantially related to the matters for which Slavitt, Connery previously represented Westgate. *See Koch v. Koch Industries,* 798 F.Supp. 1525, 1532 (D.Kan.1992); *see also Evans v. Artek Systems Corp.,* 715 F.2d 788, 791 (2d Cir.1983) (discussing the related burdens imposed on a party relying on Canon 4 of the ABA Code of Professional Responsibility).

There is no dispute that the interests of Slavitt, Connery's current clients, the plaintiffs, are adverse to those of Westgate. The court will discuss the remaining two requirements in turn, and then address any resultant prejudice to the Plaintiffs. Because the court finds that Westgate has satisfied its burdens under Rule 1.9, it will not address the possibility that Robert Slavitt will be called as a witness under Local Rule 33.

### A) Attorney Client Relationship

It is undisputed that Slavitt, Connery was general counsel to the Partnership at a time when Westgate was a general partner in the Partnership. Plaintiffs note that Westgate was represented by the law firm of Dern, Mason & Floum during the formation of the Partnership, and was represented by the law firm of Zeldes, Needle & Cooper during the removal of Westgate from the Partnership. Plaintiffs suggest

that because Westgate had this supplemental representation and never paid Slavitt, Connery any fees that no attorney client relationship existed between Slavitt, Connery and Westgate.

Westgate has submitted the affidavit of its president, John Joslyn, who owned a 33% interest in the Partnership's other general partner, Oceanic. Joslyn states that he and Westgate relied on general counsel Robert Slavitt for information regarding the formation of the Partnership and the LBS assignment, and that neither Joslyn nor Westgate relied on other counsel in these matters. Robert Slavitt has submitted an affidavit in which he states that he was retained by and dealt almost exclusively with George Tulloch, that his contacts with Joslyn were infrequent, and that he had no access to Westgate documents.

In this affidavit Robert Slavitt describes at length the extensive legal relationship he maintained with limited partner Tulloch. It is implicit in the affidavit that Robert Slavitt had an attorney client relationship with Tulloch while he was general counsel to the Partnership. Therefore, Plaintiffs essentially ask the court to find that while Robert Slavitt was general counsel for the Partnership and also counsel for a limited partner, he had no attorney client relationship with a general partner.

▪ Plaintiffs offer no support for the proposition that a general counsel for a partnership may in fact represent a limited partner and not at the same time represent a general partner. Indeed, when Robert Slavitt was appointed general counsel for the Partnership his primary duty was to the Partnership entity, not to George Tulloch or Westgate. *Cf* Model Code of Professional Responsibility EC 5–18 (1980) ("A lawyer ... retained by a corporation or similar entity owes his allegiance to the entity and not to a stockholder ... or other person connected with the entity.").

There exist several barriers to the court accepting Plaintiffs' argument that Robert Slavitt represented only Tulloch while Westgate had other representation. The most obvious problem with Plaintiffs' anal-

ysis is the fact that people, and especially businesses, often use more than one lawyer. Just because Westgate consulted with other lawyers does not mean it did not have an attorney client relationship with Robert Slavitt.

■ In addition, it is basic partnership law that every partner is an agent of the partnership and that the knowledge of a partner regarding partnership affairs is imputed to all other partners. *See* Conn.Gen. Stat. § 34–47, 34–50 (1992). This legal standard is reinforced by the affidavit of John Joslyn, which avers that as general counsel Robert Slavitt was not solely assisting George Tulloch on Partnership affairs but was also assisting Westgate and Oceanic.

Finally, the court fails to see how the duty of loyalty would allow a general counsel for a partnership to represent one partner against another partner in a suit arising out of partnership business. *See* Model Rules of Professional Conduct Rule 1.7 cmt. ("Loyalty is an essential element in a lawyer's relationship to a client."). As will be further discussed below, a major purpose underlying Rule 1.9 is to maintain public confidence in the legal system. *In re Corn Derivatives Antitrust Litigation,* 748 F.2d 157, 162 (3d Cir.1984). Such confidence is damaged when lawyers appear to use prior relationships with clients to the clients' disadvantage. *See Brennan's, Inc. v. Brennan's Restaurants, Inc.,* 590 F.2d 168, 172 (5th Cir.1979). This is precisely the image created when a general counsel to a partnership takes sides in a dispute between former partners. As Canon 9 of the ABA Code dictates, "[a] lawyer should avoid even the appearance of professional impropriety." Model Code of Professional Responsibility Canon 9 (1980).

■ Therefore, the court finds that when Robert Slavitt became general counsel for the Partnership he created an attorney client relationship with general partner Westgate which now brings Westgate within the former client ambit of Rule 1.9.

### B) Current & Former Representations: Substantial Relationship Test

In determining whether a substantial relationship exists, the court will evaluate the similarities between the factual bases of Robert Slavitt's representation of Westgate as general counsel to the Partnership and Slavitt, Connery's representation of the Plaintiffs in the instant action. *See Koch v. Koch Industries,* 798 F.Supp. 1525, 1533 (D.Kan.1992). Plaintiffs bring claims against Westgate for breach of the Partnership agreement, breach of the LBS assignment agreement, breach of fiduciary duty as a general partner, conversion of Partnership funds, and unfair trade practices.

■ Robert Slavitt drafted the Partnership and assignment agreements which outlined the duties and obligations of Westgate in the Partnership: duties and obligations which the Plaintiffs now claim Westgate has failed to meet. The court finds that there is indeed similarity between the work Robert Slavitt performed as general counsel for the Partnership and Plaintiffs' claims in the instant suit.

Plaintiffs correctly note that this is not the end of the inquiry. A major purpose underlying Rule 1.9, in addition to the maintenance of public confidence discussed above, is to limit a lawyer's use of a client's confidential information in subsequent litigation. This purpose refines the substantial relationship test to determine what confidential information the attorney was in a position to receive from the former client, and what relevance this information could have in the current case. *La Salle Nat'l Bank v. County of Lake,* 703 F.2d 252, 255 (7th Cir.1983).

■ As general counsel for the Partnership, Robert Slavitt was in a position to receive information from general partner Westgate concerning Westgate's intentions and expectations regarding its role in the Partnership. This information could well be relevant in this case, where the Plaintiffs allege Westgate committed a variety of bad acts in relation to the Partnership. The court finds that a substantial relation-

ship does exist between Robert Slavitt's representation of Westgate as general counsel to the Partnership and Slavitt, Connery's representation of the Plaintiffs.

■ Once a substantial relationship is found, there is an irrebuttable presumption that the former client revealed facts requiring the attorney's disqualification. There is no need to show that the former client actually did reveal any confidences, or whether the attorney indeed will use such information to the former client's disadvantage. *Koch,* 798 F.Supp. at 1533. As the Second Circuit noted in the context of the ABA Code:

> Such an inquiry would prove destructive of the weighty policy considerations that serve as the pillars of Canon 4 of the Code, for the client's ultimate and compelled response to an attorney's claim of non-access would necessarily be to describe in detail the confidential information previously disclosed and now sought to be preserved.... Nowhere is Shakespeare's observation that 'there is nothing either good or bad but thinking makes it so,' more apt than in the realm of ethical considerations.

*Emle Industries, Inc. v. Patentex, Inc.,* 478 F.2d 562, 571 (2d Cir.1973).

Plaintiffs take the confidentiality analysis a step further by arguing that a threshold test devised by the Second Circuit in *Allegaert v. Perot,* 565 F.2d 246 (2d Cir. 1977) makes it unnecessary to reach the substantial relationship analysis. In *Allegaert,* the Second Circuit held that the substantial relationship test was "inapposite" where the attorney was not in a position during the former representation where he could have received information which the former client reasonably expected would not be divulged to the current client. *Allegaert,* 565 F.2d at 250. The *Allegaert* rule is particularly applicable to cases where the current and former clients were once working closely together, such as when a partnership or joint venture breaks up. *Keoseian v. Von Kaulbach,* 707 F.Supp. 150, 153 (S.D.N.Y.1989). The central problem with the application of the

*Allegaert* rule to the instant case is that, as with most Second Circuit case law dealing with attorney disqualification, it is based on the ABA Code of Professional Responsibility, while the instant case is governed by the Model Rules of Professional Conduct.

This distinction is often without import, but where former clients are involved, the Model Rules and the ABA Code impose different standards, and this affects the initial application of the substantial relationship test. The *Allegaert* holding rested on ABA Code Canon 4. *Allegaert,* 565 F.2d at 251 n. 7. Canon 4 provides that "[a] lawyer should preserve the confidences and secrets of a client." Model Code of Professional Responsibility Canon 4. Neither the Canon nor the ethical considerations or disciplinary rules that follow address the specific former client situation. The Second Circuit has taken the narrow dictates of Canon 4 and developed a former client rule triggered by confidentiality. *See Allegaert,* 565 F.2d at 250. Model Rule 1.9 is designed to address not only the narrow need to protect a client's confidences, but also to establish broader standards of attorney loyalty and to maintain public confidence in the legal system. *See In re Corn Derivatives Antitrust Litigation,* 748 F.2d 157, 162 (3d Cir.1984); Model Rules of Professional Conduct Rule 1.9 cmt.

■ Second Circuit case law dealing with the substantial relationship analysis under Canon 4 is only concerned with the need to protect the former client's interest in confidential information. Where the former client should have expected any information to be shared by the lawyer with the current client, the substantial relationship test is never reached. *See Allegaert,* 565 F.2d at 250. However, the application of Rule 1.9 does not turn on the divulgence of confidences: "Information so acquired is sheltered from use by the attorney against his client by virtue of the existence of the attorney-client relationship. This is true without regard whether someone else may be privy to it." *Brennan's, Inc. v. Brennan's Restaurants, Inc.,* 590 F.2d 168, 172 (5th Cir.1979). In sum, Rule 1.9 is not

limited to situations where a former client would be harmed by the divulgence of confidential information. The rule "imposes an ethical obligation irrespective of harm." *Koch,* 798 F.Supp. at 1535 (citations omitted).

The court may reach the substantial relationship test in this case, and holds that Westgate has met its burden of demonstrating that a substantial relationship does exist under Rule 1.9 between Robert Slavitt's representation of Westgate as general counsel to the Partnership and Slavitt, Connery's representation of the Plaintiffs.

*C) Resultant Prejudice to the Plaintiffs*

 It is appropriate for the court to consider the prejudice the Plaintiffs may suffer by having their counsel disqualified. *See Keoseian v. Von Kaulbach,* 707 F.Supp. 150, 155 (S.D.N.Y.1989). The general rule is that motions to disqualify counsel filed shortly before trial after much discovery has been conducted work great prejudice on the counsel's client, while motions filed shortly after an action has commenced pose minimal prejudice. *See Richards v. Badaracco,* 1988 WL 147152, 1988 U.S.Dist. LEXIS 15495, at *17–18 (D.N.J. June 24, 1988).

 When Plaintiffs filed their complaint in this action in July, 1988 they were represented by the law firm of Whitman & Ransom. There was limited discovery in the ensuing two years due to the pendency of related actions and the ongoing settlement negotiations of the parties. Slavitt, Connery replaced Whitman & Ransom as Plaintiffs' counsel in December, 1990. In February, 1991 Westgate made its motion to disqualify, and no discovery has taken place since that date. Because the motion to disqualify was made only two months after Slavitt, Connery made an appearance in this case, and because there has been limited discovery conducted so far, the court finds that the Plaintiffs will not be prejudiced by the disqualification of Slavitt, Connery.

## CONCLUSION

For the reasons set forth above, Defendant Westgate's motion to disqualify the law firm of Slavitt, Connery and Vardamis from representing the Plaintiffs in this action is GRANTED. An order shall issue.