**Kenneth NELSON, et al., Plaintiffs,**

v.

**GREEN BUILDERS, INC.,
et al., Defendants.**

No. 89–C–1072.

United States District Court,
E.D. Wisconsin.

June 11, 1993.

Garh A. Ahrens, Michael, Best & Friedrich, Milwaukee, WI, for plaintiffs.

Ronald L. Wallenfang, Quarles & Brady, Milwaukee, WI, for defendants.

## DECISION AND ORDER

WARREN, Senior District Judge.

Before the Court is plaintiff Thomas J. Misco's motion to disqualify the law firm of Quarles & Brady from further representation of the defendants in the above-captioned action.

## I. UNDISPUTED FACTS

In 1985, Green Builders, Inc. ("GBI"), Kenneth E. Nelson, and Mitchell A. Anderson, as general partners, and Thomas J. Misco, as a limited partner, formed Brookfield RI Partners (the "Partnership"), for the purpose of developing a Residence Inn in Brookfield, Wisconsin. (Brief in Opposition to Plaintiffs' Disqualification Motion ("Defendants' Brief") at 1.) The Partnership in turn contracted with GBI to construct the Brookfield Residence Inn. (*Id.;* Nelson Aff. ¶ 3.) The Partnership never built the project, however, and the parties have been involved in a legal dispute ever since. (Defendants' Brief at 1.)

From April 1985 through September 1985, Misco was, in some capacity, represented by Attorney Mary Neese Fertl of the Milwaukee, Wisconsin law firm of Weiss, Steuer, Berzowski, Brady & Donahue (the "Weiss firm"). (*Id.* at 2; Motion to Disqualify the

Firm of Quarles & Brady from Further Representation of the Defendants at 1, ¶ 1 ("Misco's Motion").) Fertl left the Weiss firm in 1986 and joined the Milwaukee, Wisconsin law firm of Whyte & Hirschboeck, where she practiced for three (3) years. (Defendants' Brief at 4). Then, in October 1989, Fertl joined the Milwaukee, Wisconsin law firm of Quarles & Brady ("Quarles"). (*Id.;* Misco's Motion at 4, ¶ 9.)

Billing records show that Misco was charged approximately $7,985.00 for the services provided by the Weiss firm. (Misco's Motion at 4, ¶ 8.) Misco sent copies of the Weiss firm's invoices to the Partnership, in care of Nelson, and asked that they be paid by the Partnership, stating that they were "for services provided to the Brookfield RI Partners." (Defendants' Brief at 3; Ahren's Aff., Composite Ex. A.)

Quarles has represented GBI since 1988. (Defendants' Brief at 1.) GBI hired Quarles on or about June 29, 1988 to defend it in an arbitration commenced by the dissolved Partnership. (Wallenfang Aff. ¶ 1.) The arbitration concluded May 31, 1989, when the arbitrators ruled that they lacked jurisdiction to proceed. (*Id.*) Following that arbitration, Nelson, Anderson and Misco (the "Plaintiff Partners"), represented by the Milwaukee, Wisconsin law firm of Michael, Best & Friedrich, commenced two lawsuits. Plaintiff Partners filed the above-captioned action on or about September 20, 1989, and a related state court action on July 29, 1991. (Defendants' Brief at 1; Wallenfang Aff. ¶ 2.)

On November 1, 1989, Ronald Wallenfang of Quarles filed an answer on behalf of GBI in opposition to the complaint of Plaintiff Partners. Plaintiff Partners allege that GBI breached the Partnership Agreement. (Misco's Motion at 4, ¶ 10; Defendants' Brief at 1.) Quarles, and specifically Attorney Wallenfang, have represented Defendants since the inception of the two lawsuits. (Wallenfang Aff. ¶ 2.)

Fertl's name was mentioned and spelled out on April 9, 1990 at a deposition taken in the above-captioned case.[1] She was identi-

---

1. Defendants also note that Fertl's name was mentioned during a deposition taken in this case

fied as the author of a letter dated May 16, 1985 to Nelson and GBI. Wallenfang represented GBI at the deposition. (Misco's Motion at 5 ¶ 13; Wallenfang Aff. ¶ 18, and Ex. J.)

Misco became aware that Fertl had joined Quarles on Thursday, March 12, 1992. (Misco Aff. ¶ 6.) Quarles has not at any time obtained Misco's consent to its representation against him in the above-captioned action. (Misco's Motion at 5, ¶ 14; Misco Aff. ¶ 5.) Misco has demanded that Quarles withdraw from further representation, but they have not done so. (Misco's Motion at 5, ¶ 16.) Misco has thus moved to disqualify Quarles on the basis of Fertl's past representation of him. (Defendants' Brief at 5.)

Before Fertl joined Quarles, the firm performed a conflicts review. At that time, Fertl did not disclose her past representation of Misco. (Defendants' Brief at 4; Urdan Aff. ¶ 4.) On March 13, 1992, Attorney Gary Ahrens of Michael, Best & Friedrich, representing Plaintiff Partners, telephoned Fertl concerning the above-captioned matter. Fertl told Ahrens that she could not recall anything about her past representation of Misco. In response to Ahrens' concerns, Quarles took measures to insulate Fertl from all contact with this case. As part of Quarles' screening arrangement, all files containing GBI material have been separated and kept locked, with access limited to Wallenfang and a paralegal. In addition, Fertl has been barred from participating in any discussions related to the merits of this case. Lastly, access codes to any information related to this case stored on electronic software have been kept secret. (Wallenfang Aff. ¶¶ 16, 17, & Ex. N.)

There are currently 185 lawyers in Quarles' Milwaukee office, a number that has increased only slightly since 1989. Fertl and Wallenfang work on different floors in different departments.

Since the beginning of the above-captioned case, twenty-two (22) days of depositions have been taken, amounting to 2831 pages. (Wallenfang Aff. ¶ 21.)

on January 14, 1991, in conjunction with a letter she sent to GBI, Anderson and Nelson on July

In their Second Amended Complaint, Plaintiff Partners allege that they have performed all of their obligations under the Partnership Agreement. Defendants have denied this allegation in their answer. (Misco's Motion at 4, ¶ 12.) Under the terms of the Partnership Agreement, Misco agreed to contribute certain items to the Partnership, including: (1) a commitment to issue a franchise agreement to build a Residence Inn in Brookfield, Wisconsin; (2) a contract to lease grounds in Brookfield, Wisconsin for construction of a Residence Inn; and (3) all necessary approvals and permits to construct a Residence Inn in Brookfield, Wisconsin. (Misco's Motion at 4, ¶ 11; *see also* Second Amended Complaint, Ex. A.)

## II. DISPUTED FACTS

The scope of Fertl's representation, which is alleged as the basis for Misco's motion, is disputed.

### A. MISCO'S VERSION

Misco alleges that Fertl represented him personally with regard to the Limited Partnership Agreement which he signed on May 31, 1985, the Brookfield Residence Inn project, and the Partnership's affairs. (Misco's Motion at 1–2, ¶ 1; Misco Aff. ¶¶ 2, 3.) The Weiss firm's file cataloguing the Misco representation firm contains over thirty (30) separate items of written correspondence related to the Partnership's Residence Inn project. Except one, all are addressed to or from Fertl. (Id. at 2, ¶ 2.)

The correspondence shows that the services performed by Fertl for Misco before he signed the Partnership Agreement on May 31, 1985 included:

a. Review of the Limited Partnership Agreement.

b. Drafting an Assignment of Contract for Lease for the Landlord for the proposed Inn and a Consulting Agreement between Misco and the Partnership.

30, 1985. (Wallenfang Aff. ¶ 19; and Ex. L.)

c. Reviewing title insurance matters regarding the proposed Inn.

d. Corresponding with attorneys for the owner of the land proposed for the Inn.

e. Redrafting the Consulting Agreement.

f. Reviewing the Construction Agreement and Development Agreement with the proposed franchisor.

g. Drafting an Assignment of the Brock Residence Inn's Commitment Agreement and Brock Residence Inn's Development Agreement.

h. Resolving title problems regarding the land for the proposed Inn.

i. Obtaining assignment of rights to plans for the proposed Inn.

j. Providing documentation relating to the Consulting Agreement between Misco and the Partnership concerning the plans for the proposed Inn.

(*Id.* at 2–3, ¶ 3(a)–(j).) The correspondence also shows that the services performed by Fertl for Misco after he signed the Partnership Agreement on May 31, 1985 included:

a. Preparing a closing book of the documents signed on May 31, 1985.

b. Reviewing correspondence from the Residence Inn Company.

c. Consulting with Misco regarding the one-page agreement signed by Green Builders, Nelson and Misco in Denver on January 24, 1985.

d. Consulting with Misco regarding his rights and potential claims against the Partnership.

e. Monitoring discussions between the partners regarding proposed modifications of the Partnership Agreement.

f. Advising Misco regarding discussions of forming a new partnership to develop the Inn.

(*Id.* at 3, ¶ 4(a)–(f).)

In addition, Fertl advised Misco that the Partnership Agreement and Construction Contract signed by GBI on May 31, 1985 obligated GBI to provide construction financing for the Inn. (*Id.* ¶ 5; Misco Aff. ¶ 4.) On July 24, 1985, Misco informed Plaintiff Partner Nelson, in a telephone conversation, of Fertl's opinion as to GBI's obligation to finance construction of the Inn. (Nelson Aff. ¶ 4, and Ex. A.)

**B. DEFENDANTS' VERSION**

Defendants allege that when Misco sought counsel from the Weiss firm, he represented that he was acting as an agent of the Partnership. Most of the documents in the Weiss firm's file, Defendants further allege, are consistent with that representation. The exceptions are two letters that appear to have been written on behalf of Misco Corp. and one on behalf of Misco personally. (Defendants' Brief at 2.)

According to selected documents made available by Misco, Defendants argue, almost all of Fertl's work involved a consulting agreement between Misco Corp. and the Partnership, in addition to title insurance, lease, assignment and zoning matters incident to getting land and franchise rights assigned to the Partnership. (*Id.; see also* Ahren's Aff., Composite Exs. A, B, & E.) None of those matters are at issue in the above-captioned case. (Defendants' Brief at 2.) No correspondence to or from Fertl, they claim, makes any reference to the Partnership Agreement that is at issue in the above-captioned case. (*Id.* at 3.)

**III. LEGAL FRAMEWORK**

 Ethical questions before the Court are governed by both precedent and the precepts of the Model Rules of Professional Conduct promulgated by the American Bar Association ("ABA"). Ethical questions before a district court are governed by federal law. *See Freeman v. Chicago Musical Instrument Co.,* 689 F.2d 715, 722 (7th Cir. 1982); *Powell v. Adams,* 763 F.Supp. 406, 407 (E.D.Wis.1991) (Gordon, J.). The standards applied, however, are not dissimilar to those applied by the Wisconsin Supreme Court. *See* Wisconsin Supreme Court Rule 20:1.1, *et seq.* On the whole, both court systems have adopted the Model Rules of Professional Conduct promulgated by the American Bar Association ("ABA"). *Powell,* 763 F.Supp. at 407 (citing *Rand v. Monsanto,* 926 F.2d 596, 600 (7th Cir.), *aff'd,* 946 F.2d 897 (1991)). Motions to disqualify focus a district court's attention on one ethical prin-

ciple in particular: a lawyer must maintain the confidentiality of information relating to the representation of a client.[2] *See Freeman*, 689 F.2d at 721. Thus, for instance, a lawyer may not use confidential information that he or she receives from a former client against that client in representation of another.

■ The district court maintains the "duty to safeguard the sacrosanct privacy of the attorney-client relationship," *id.*, and thus has discretionary authority to disqualify counsel.[3] *Id.* The Court must recognize, of course, that opposing one party's interest in preserving confidential communications is another party's interest in being represented by the counsel of its choice. *See Schiessle v. Stephens*, 717 F.2d 417, 420 (7th Cir.1983). Although disqualifying counsel protects one attorney-client relationship, it destroys another by denying a party its chosen representation. *Freeman*, 689 F.2d at 721. Motions to disqualify counsel, moreover, should be resolved with extreme caution because they may be used abusively as a litigation tactic, when, for example, a movant is facing a formidable opponent. *See Freeman*, 689

F.2d at 722; *Atasi Corp. v. Seagate Technology*, 847 F.2d 826, 832 (D.C.Cir.1988). A successful movant may thus create both psychological hardship, by requiring an opponent to obtain and trust different counsel, and financial hardship, by requiring an opponent to incur additional fees while new counsel becomes familiar with the litigation.[4] The Seventh Circuit has thus described disqualification as "a drastic measure which district courts should hesitate to impose except when absolutely necessary." *Freeman*, 689 F.2d at 721; *see also Schiessle*, 717 F.2d at 420.

■ In addressing a motion to disqualify, the threshold question is whether there existed an attorney-client relationship that subjected a lawyer to the ethical obligation of preserving confidential communications. *See Westinghouse Electric Corp. v. Kerr–McGee Corp.*, 580 F.2d 1311 (7th Cir.), *cert. denied*, 439 U.S. 955, 99 S.Ct. 353, 58 L.Ed.2d 346 (1978); *Powell*, 763 F.Supp. at 408; *Dalrymple v. National Bank & Trust Co. of Traverse City*, 615 F.Supp. 979, 983 (W.D.Mich.

2. This principle is expressly recognized by Canon 4 of the ABA Code of Professional Responsibility, which protects the confidences of a client against disclosure and possible use against him, and is also embodied by Canon 9, which provides that a lawyer must avoid even the appearance of impropriety. *Freeman*, 689 F.2d at 721. The ABA Model Rules of Professional Conduct supplanted the Code in 1983. The principle of preserving client confidences is reflected in Model Rule 1.7, which prohibits a lawyer's representation of a client whose interests are adverse to another client, Model Rule 1.9, which limits a lawyer's ability to enter into new attorney-client relationships that affect the interests of the lawyer's former clients, and Model Rule 1.10, which allows, under certain circumstances, the conflicts of one lawyer in a law firm to be imputed to other lawyers in that firm.

3. Disqualification rules apply equally to sole practitioners, small firms and large firms "even though the burden of complying with ethical considerations will naturally fall more heavily upon [large firms]." *Westinghouse Electric Corp. v. Kerr–McGee Corp.*, 580 F.2d 1311, 1321 (7th Cir.), *cert. denied*, 439 U.S. 955, 99 S.Ct. 353, 58 L.Ed.2d 346 (1978).

4. As Judge Coffey has explained:
[D]isqualification of an attorney may also adversely affect the client as disqualification deprives the individual of the representation of

the attorney of his choice and "it may also be difficult, if not impossible, for an attorney to master 'the nuances of the legal and factual matters' late in the litigation of a complex case."
*Analytica, Inc. v. NPD Research, Inc.*, 708 F.2d 1263, 1275 (7th Cir.1983) (Coffey, J., dissenting) (quoting *Freeman*, 689 F.2d at 719–720). In the same opinion, Judge Coffey also noted the effect of disqualification on the target lawyer's reputation:
[C]ounsel ... should not only be allowed to protect their relationship with their present client but also their good name and reputation for high ethical standards. After all, an attorney's and/or a law firm's most valuable asset is their professional reputation for competence, and above all honesty and and integrity, which should not be jeopardized in a summary type of disqualification proceeding of this nature. As court proceedings are matters of public record, a news media report concerning a summary disqualification order, based on a scant record of this type, can be irreparable harm to an attorney's or law firm's professional reputation. We must recognize that the great majority of lawyers, as officers of the court, do conduct themselves well within the bounds of the Code of Professional Responsibility.
*Analytica*, 708 F.2d at 1275 (Coffey, J., dissenting).

1985). A party establishes an implied attorney-client relationship if it shows (1) that it submitted confidential information to a lawyer, and (2) that it did so with the reasonable belief that the lawyer was acting as the party's attorney. *Id.* at 1319–20; *Analytica, Inc. v. NPD Research, Inc.,* 708 F.2d 1263, 1268–69.[5] *See also DCA Food Industries, Inc. v. Tasty Foods, Inc.,* 626 F.Supp. 54, 59–60 (W.D.Wis.1985); *Kearns v. Fred Lavery Porsche Audi Co.,* 745 F.2d 600, 603 (D.C.Cir.1984), *cert. denied,* 469 U.S. 1192, 105 S.Ct. 967, 83 L.Ed.2d 971 (1985). To create an attorney-client relationship, it is not necessary that the parties execute a formal contract, *Kerr–McGee,* 580 F.2d at 1317, or that, the relationship be dependent upon the payment of fees. *Id.* at 1317 & n. 6. A fiduciary relationship may arise solely from the nature of the work performed and the circumstances under which confidential information is divulged. *Kerr–McGee* at 1320.

When a district court finds an attorney-client relationship it applies a test well-settled in the Seventh Circuit. A lawyer may be disqualified where he or she represents a party in a matter in which the adverse party is that lawyer's former client, if the subject matter of the two representations is "substantially related."[6] *See Analytica,*

5. In *Kerr–McGee,* three of the defendants were members of the American Petroleum Institute ("API"), a trade association represented by Kirkland & Ellis ("Kirkland"). API retained Kirkland to analyze the antitrust implications of proposed oil industry divestiture legislation. As part of their study, Kirkland interviewed and sent questionnaires to various API members, among them Kerr–McGee, Gulf Oil and Getty Oil ("API defendants"). In response, Kirkland acquired secret and confidential information. Using this information, Kirkland filed a report with API which contained references to its members' involvement in the production and marketing of uranium. On the same day Kirkland released its report, another client of Kirkland, Westinghouse, filed suit against the API defendants and another defendant, alleging price-fixing in the uranium industry. The district court denied the API defendants' motion to disqualify Kirkland, finding that there had been no attorney client relationship between Kirkland and the API defendants, only a relationship between Kirkland and API. The Seventh Circuit reversed, holding that an implied attorney-client relationship existed between Kirkland and the API defendants. The court found that the API defendants submitted confidential information to Kirkland and reasonably believed that the firm was acting in the undivided interest of all API members. *Kerr–McGee,* 580 F.2d at 1321. In *Analytica,* the Seventh Circuit again explained that the sharing of confidential information may create an attorney-client relationship. John Malec was employed by and, with two others, co-owned NPD. The other co-owners offered Malec additional shares in NPD, and told Malec to find a lawyer who would structure the transaction in the least costly way. Malec contacted Richard Fine, a partner in the law firm of Schwartz & Freeman. Fine devised a plan that required him to value the NPD stock. NPD gave Fine the information necessary for the valuation, including information on NPD's financial condition, sales trends and management. Fine then fixed a value which NPD adopted. Fine billed NPD for his services and NPD paid the bill. When relations between Malec and his co-owners deteriorated, Malec left NPD and sold his stock back to the other co-owners. At the same time, Malec's wife, who also worked for NPD, left NPD and formed Analytica to compete with NPD. (Malec apparently never held a position with Analytica.) Within months after the Malecs left NPD, Analytica retained Schwartz & Freeman as its counsel in a private antitrust action against NPD. On NPD's motion, the district court disqualified Schwartz & Freeman from representing Analytica against NPD. On appeal, Schwartz & Freeman did not argue that it had not received confidential information about NPD in the course of negotiating the stock transfer, but rather that its client had been Malec, not NPD. The Seventh Circuit rejected this argument on two grounds. First, the court found that all three co-owners shared an interest in structuring an inexpensive stock transfer, that NPD paid the legal bill (and apparently NPD did not usually pay its officers' legal expenses), and that neither NPD nor the other co-owners were represented by other counsel. *Analytica,* 708 F.2d at 1268. Second, the court reasoned that it made no difference whether NPD or Malec was the client because disqualification was necessary under the *Kerr–McGee* rule of implied representation. Even if NPD did not formally retain Schwartz & Freeman, it supplied the firm with the confidential data that it would have furnished another lawyer. *Id.* at 1268–69.

6. Model Rules of Professional Conduct Rule 1.9 is consistent with this common law rule. Rule 1.9 provides:

A lawyer who has formerly represented a client in a matter shall not thereafter:
(a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation; or
(b) use information relating to the representation to the disadvantage of the former client except as Rule 1.6 would permit with respect to a client or when the information has become generally known.

708 F.2d at 1267. In other words, a lawyer may not switch sides in substantially related representations. The substantially related test also applies to motions seeking imputed or vicarious disqualification; *i.e.*, when a lawyer's firm represents a party in a matter in which the adverse party was represented by that lawyer as a member of another firm or by that lawyer's former firm.[7] *See Freeman,* 689 F.2d at 722; *LaSalle National Bank v. County of Lake,* 703 F.2d 252, 255 (7th Cir. 1983); *Schiessle,* 717 F.2d at 420.

■ A representation is substantially related to a prior representation when the lawyer *could have obtained* confidential information in the first that would have been relevant in the second. *LaSalle Nat'l Bank,* 703 F.2d at 255; *Analytica,* 708 F.2d at 1266. If a substantial relationship is found, it is unnecessary for the former client to prove that the lawyer actually received confidential information and used it against him or her. *Id.* Moreover, an attorney or party need not divulge any confidences to prove that they were revealed. *Novo Terapeutisk Laboratorium A/S v. Baxter Travenol Laboratories, Inc.,* 607 F.2d 186, 195 (7th Cir.1979) (en banc).

■ The substantial relationship test requires a court to conduct a three-part inquiry. First, the court must factually reconstruct the scope of the prior legal representa-

tion. Second, it must determine whether it is reasonable to infer that the confidential information allegedly given would have been given to a lawyer representing a client in the prior matters. Third, the court must decide whether that information is relevant to the issues raised in the litigation pending against the former client. *LaSalle Nat'l Bank,* 703 F.2d at 255–56 (citing *Westinghouse Electric Corp. v. Gulf Oil Corp.,* 588 F.2d 221, 225 (7th Cir.1978); *Novo Terapeutisk,* 607 F.2d at 195).

■ If the court finds that the representations are substantially related, then a presumption arises that the lawyer received confidential information during his or her prior representation. When a lawyer or firm switches sides as in *Analytica,* the presumption of shared confidences is irrebuttable and thus disqualification is proper, absent the consent of, or waiver by, the former client.[8] *Analytica,* 708 F.2d at 1267; *Schiessle,* 717 F.2d at 420 n. 2. *Analytica* recognizes an exception to this rule, however, where a lawyer in a firm (or in a government legal department) changes jobs, and later that lawyer or his or her new firm represents an adversary of a client of his or her former firm. In such a case, even if the two matters are substantially related, the lawyer and his or her new firm may rebut the presumption

---

Model Rules of Professional Conduct Rule 1.9 (1983).

7. Model Rules of Professional Conduct Rule 1.10 codifies this common law rule. Rule 1.10 provides:

(a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7, 1.8(c), 1.9 or 2.2.
(b) When a lawyer becomes associated with a firm, the firm may not knowingly represent a person in the same or a substantially related matter in which that lawyer, or a firm with which the lawyer was associated, had previously represented a client whose interests are materially adverse to that person and about whom the lawyer had acquired information protected by Rules 1.6 or 1.9(b) that is material to the matter.
(c) When a lawyer had terminated an association with a firm, the firm is not prohibited from thereafter representing a person with in-

terests materially adverse to those of a client represented by the formerly associated lawyer unless:
 (1) the matter is the same or substantially related to that in which the formerly associated lawyer represented the client; and
 (2) any lawyer remaining in the firm has information protected by Rules 1.6 and 1.9(b) that is material to the matter.
(d) A disqualification prescribed by this rule may be waived by the affected client under the conditions stated in Rule 1.7.
Model Rules of Professional Conduct Rule 1.10 (1983).

8. A former client may consent to representation of an opponent by former counsel. In addition, a former client may waive his or her right to move for imputed disqualification where the former client knowingly refrains from asserting it promptly. Waiver protects an opponent's freedom of choosing its legal counsel and prevents the tactical use of motions to disqualify. *Atasi Corp. v. Seagate Technology,* 847 F.2d 826 (D.C.Cir.1988).

and avoid disqualification. *Analytica,* 708 F.2d at 1267.

 Under the *Analytica* exception, a court undertakes two levels of analysis. Absent consent or waiver, a lawyer representing an adversary of his or her former client in a substantially related matter must rebut the presumption of shared confidences with the former client to avoid disqualification. *See Freeman,* 689 F.2d at 722. Under the exception, a presumption of intra-firm sharing also arises; *i.e.,* secrets brought by the lawyer to a new firm are presumed to be passed to all members of that firm. Notwithstanding the individual lawyer's personal disqualification, the lawyer's new firm must rebut this second presumption to avoid imputed disqualification. *See LaSalle Nat'l Bank,* 703 F.2d at 257. In a case where a former client is seeking imputed disqualification, the presumptions may be rebutted even if the two matters are substantially related. *Analytica,* 708 F.2d at 1267.

If a fact situation falls within the *Analytica* exception, the court first determines whether the presumption of shared confidences with respect to the former representation has been rebutted. *Schiessle,* 717 F.2d at 420. The presumption is rebutted if, for example, the lawyer whose change of employment created the disqualification issue was not actually privy to any of the confidential information that his or her prior law firm received from the party now seeking disqualification of his or her present firm. *Id.* In evaluating the rebuttal evidence, the court may consider, *inter alia,* the size of the lawyer's firm, his or her area of specialization

and his or her position within the firm. *Freeman,* 689 F.2d at 723.

If the presumption as to shared confidences during the former representation has not been rebutted, then the court determines whether the presumption of shared confidences has been rebutted with respect to the present representation. *Id.* A targeted law firm can rebut the latter presumption by demonstrating that specific institutional mechanisms (*e.g.,* "Chinese walls") had been employed to prevent any flow of confidential information from the "tainted" lawyer to any other members of his or her present firm. *LaSalle Nat'l Bank,* 703 F.2d at 257; *Schiessle,* 717 F.2d at 421.

 The court evaluates the effectiveness of such insulating mechanisms, or screens, on a case-by-case basis. *Schiessle,* 717 F.2d at 421. In doing so, the court may consider, *inter alia,* the following factors: the size and structural divisions of the law firm involved, the likelihood of contact between the tainted lawyer and the specific lawyers responsible for the present representation, and the existence of rules which prevent the tainted lawyer from gaining access to relevant files or other information pertaining to the present representation or which prevent the tainted lawyer from sharing in the fees derived from the representation. *Id.; LaSalle Nat'l Bank,* 703 F.2d at 257.[9] In addition, screening arrangements must be timely to avoid disqualification. Screens must, therefore, be in place when the potentially disqualifying event occurs, which, depending upon the facts, can be either when the tainted attorney first joins the firm or when the firm agrees to representation rais-

---

9. The Seventh Circuit in *LaSalle Nat'l Bank* found that effective screening arrangements share certain characteristics, and noted, with approval, several examples. In a Second Circuit case, sworn statements by the tainted lawyer and others at the firm showed that the tainted lawyer was denied access to relevant files and documents, did not share in fees generated by the litigation, and could not discuss the litigation. *Armstrong v. McAlpin,* 625 F.2d 433, 442–43 (2d Cir.1980) (en banc), *vacated on other grounds,* 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981). A screen approved by the Court of Claims was similarly specific: all other attorneys in the firm were forbidden to discuss the case with the disqualified lawyer and were instructed to prevent any documents from reaching him; and the files were kept in a locked file cabinet, with the keys controlled by two partners and issued to others only on a "need to know" basis. *Kesselhaut v. United States,* 555 F.2d 791 (Ct.Cl. 1977). Further, in both cases, as well as in *Greitzer & Locks v. Johns–Manville Corp.,* No. 81–1379, slip op. at 7 (4th Cir. Mar. 5, 1982), *aff'd per curiam,* 710 F.2d 127 (4th Cir.), *cert. denied,* 459 U.S. 1010, 103 S.Ct. 364, 74 L.Ed.2d 400 (1982), the screening arrangements were established when the potentially disqualifying event occurred, either when the attorney first joined the firm or when the firm accepted a case presenting an ethical problem. *LaSalle Nat'l Bank,* 703 F.2d at 259.

ing ethical questions. *LaSalle Nat'l Bank,* 703 F.2d at 259 & n. 3. It thus appears that in the Seventh Circuit, a mere informal understanding as to nonparticipation, and uncontradicted affidavits denying past or future sharing of confidences within the targeted law firm, are insufficient to rebut the presumption of intra-firm sharing. Craig A. Peterson, *Rebuttable Presumptions and Intra–Firm Screening: The New Seventh Circuit Approach to Vicarious Disqualification of Litigation Counsel,* 59 Notre Dame L.Rev. 399, 411 (1984).

The courts apply a very strict standard of proof when evaluating evidence offered to rebut the two presumptions of shared confidences on a motion for imputed disqualification. This heavy rebuttal burden is satisfied only with "clear and effective" proof. *Schiessle,* 717 F.2d at 420; *Freeman,* 689 F.2d at 723. Moreover, the Court resolves any doubts as to the existence of an asserted conflict of interest in favor of disqualification. *LaSalle Nat'l Bank,* 703 F.2d at 257 (citing *Gulf Oil,* 588 F.2d at 225).

## IV. ANALYSIS

Misco has moved for disqualification of Quarles & Brady on the basis of Attorney Fertl's past representation of him. The issue herein is whether Quarles may represent Defendants in the above-captioned matter where Defendants' interests are materially adverse to the interests of Misco, Fertl's former client, and where Fertl was not associated with Quarles at the time she represented Misco.[10] The Court must decide, therefore, whether Fertl has a conflict of interest and whether that conflict should be ascribed to Quarles. This is a question of imputed disqualification.

The parties dispute whether Fertl entered an attorney-client relationship with Misco or the Partnership. Misco argues that Fertl represented him in his personal capacity, while Defendants argue that Fertl represent-

ed the Partnership as an entity. (*See* Misco's Motion at 1–2; Defendants' Brief at 2.) It appears to the Court that Fertl may have represented the interests of both Misco and the Partnership at various times, and her legal work for both is not easily distinguishable. The Court need not, however, determine which party Fertl represented to resolve Misco's motion.

Although Fertl's legal work for Misco seems to be entwined with the interests of the Partnership, the Court finds that Fertl entered an attorney-client relationship with Misco in his personal capacity. Among other things, Misco retained Fertl to draft the Consulting Agreement executed by Misco and the Partnership, draft the Assignment of Contract for Lease executed by Misco and the Partnership, review the Commitment and Development Agreements entered into by the franchisor, and review the one-page agreement signed by GBI, Nelson and Misco on January 24, 1985 (Wallenfang Aff., Exs. J, K, G, & L.) This work is consistent with Misco's obligations under the Partnership Agreement, namely, to provide a franchise agreement, a contract to lease grounds in Brookfield, Wisconsin, and all necessary approvals and permits. (Misco's Motion at 4, ¶ 11; Second Amended Complaint, Ex. A.) Misco and Fertl, therefore, entered an attorney-client relationship within the meaning of *Kerr–McGee.* Pursuant to this relationship, Misco submitted confidential information to Fertl with a reasonable belief that she was representing him in his capacity as a limited partner. *Kerr–McGee,* 580 F.2d at 1319–20. Furthermore, even if the Partnership paid a portion of Misco's legal fees, as Defendants allege, Fertl's attorney-client relationship with Misco was not altered or destroyed. (*See* Defendants' Brief at 2; Ahren's Aff., Composite Ex. A.)

The Court finds that Fertl may have also formed an attorney-client relationship with the Partnership.[11] For example, Misco was

---

10. Whether or not the Partnership is Fertl's former client, Misco's motion requires no more than that the interests of Defendants are alleged to be materially adverse to those of at least one of the plaintiffs. The court thus need not find that the Partnership is Fertl's former client to decide Misco's motion to disqualify Quarles & Brady.

11. People, and businesses in particular, often seek counsel from more than one lawyer. Whether or not the Partnership consulted with other lawyers, it may have created an attorney-client relationship with Fertl. *See Prisco v. West-*

not expressly obligated to clear any title problems related to the Residence Inn project under the Partnership Agreement, yet Fertl resolved title insurance matters concerning the land for the project. (Ahren's Aff., Composite Ex. A.) This work was presumably in the interest of the Partnership as a whole.[12] Further, even if Fertl was not formally retained by the Partnership, any legal work she did on its behalf fell within an implied attorney-client relationship. *Kerr–McGee*, 580 F.2d at 1319–02.

■ The Court's finding that Fertl entered an attorney-client relationship with one or more of the parties involved in the above-captioned matter is enough to satisfy the threshold inquiry. Fertl, therefore, was subject to the ethical obligation of preserving confidential communications. *Kerr–McGee*, 580 F.2d at 1311; *Powell*, 763 F.Supp. at 408. Accordingly, Fertl could not later use the confidential information she obtained from Misco, and possibly the other partners, against them on behalf of another client.[13]

■ Regardless of whether Fertl represented Misco, the Partnership or both,[14] the

interests of Defendants are adverse to those of both Misco and the Partnership. The above-captioned matter arose out of an alleged breach of the Partnership Agreement, and three partners are now suing the fourth partner, among others. It is clear, therefore, that the interests of Defendants are adverse to Misco and the two other Plaintiff Partners. The Court thus finds that Fertl established a prior attorney-client relationship with at least one adverse party in the above-captioned matter.

The next question is whether Fertl's prior representation is substantially related to Quarles' present representation of Defendants. If Fertl could have obtained confidential information in her representation of Misco and/or the Partnership that is relevant to the above-captioned matter, then Quarles' present representation of Defendants is substantially related to Fertl's former representation. *LaSalle Nat'l Bank*, 703 F.2d at 255. It is not necessary, of course, for Misco to prove that Fertl actually received confidential information that would be useful to Quarles' representation.[15] *Id.*

---

gate *Entertainment, Inc.*, 799 F.Supp. 266, 269–70 (D.Conn.1992).

12. Resolving title insurance problems, however, may have been incidental to Misco's obligation under the Partnership Agreement to "contribute ... a contract to lease grounds in Brookfield, Wisconsin ... for the construction of a Residence Inn." (Second Amended Complaint, Ex. A.) If so, then Fertl's work, although in the Partnership's interests, was directly related to Misco's obligations as a limited partner.

13. Even if Fertl represented the Partnership, the duty of loyalty prohibits general counsel for a partnership from representing one partner against another partner in a suit arising out of partnership business. *See* Model Rules of Professional Conduct Rule 1.7 cmt. (1983), *quoted in Prisco*, 799 F.Supp. at 270 ("Loyalty is an essential element in a lawyer's relationship to a client"). A major purpose in providing for attorney disqualification is the maintenance of a client's and the public's confidence in the legal system. *See Analytica*, 708 F.2d at 1266. This confidence is damaged when lawyers appear to use confidential information obtained from a former client to that client's disadvantage. The Court is agrees with the *Prisco* court's conclusion that "[t]his is precisely the image created when a general counsel to a partnership takes sides in a dispute between former partners." *Prisco*, 799 F.Supp. at 270. Therefore, if Fertl represented

Misco in his personal capacity, she could not later use the confidential information she received to his disadvantage. If Fertl represented the Partnership, she could not later use the information she received from the partners in representing one of the partners in a dispute arising out of the partnership. The Court thus finds that Fertl had a duty to maintain the confidentiality of the information she received during her prior representation, whatever its scope.

14. While the Court questions the wisdom of an attorney who represents both a limited partner and the partnership, Defendants offer nothing to preclude such dual representation.

15. Defendants contend that Fertl represented the Partnership, not Misco, in 1985. As such, they assert, the partners cannot claim the attorney-client privilege as to communications with Fertl. Based on these contentions, however, Defendants wrongly argue that there exists between the partners no confidential information that Fertl would have to preserve. They then assert that because Fertl has no confidential information that could be used against the partners, disqualification is not appropriate. (Defendants' Brief at 11–13.) The Court rejects this argument. First, the record indicates that Fertl did legal work for Misco as a limited partner, and Misco could reasonably expect her to maintain the confidence of his communications. Further, even if Fertl also rep-

Applying the three-pronged inquiry outlined in *Gulf Oil*, the Court finds that Quarles' present representation of Defendants is substantially related to Fertl's prior representation of Misco and/or the Partnership. First, the record adequately provides a factual reconstruction of the scope of Fertl's prior representation. Defendants contend that Fertl did not receive any confidential information material to the present dispute. (Defendants' Brief at 14.) Misco, however, retained Fertl to help him fulfill his obligations under the Partnership Agreement. The Court agrees with Misco that in drafting the agreements between Misco and the Partnership, Fertl must have been aware of the goals and intentions of the partners in setting up the Partnership, in addition to Misco's goals and intentions as a limited partner. (Reply Brief in Support of Motion to Disqualify Quarles & Brady at 7–8.) It would have been difficult for Fertl to provide Misco with competent legal advice if she had not reviewed the Partnership Agreement and understood those goals. Although Fertl may not have been involved in negotiating and drafting the Partnership Agreement—the subject of this litigation—she was clearly privy to information concerning the partners' intentions and goals in entering the Partnership, as well as their performance under the Partnership Agreement. For example, Fertl advised Misco that the Partnership Agreement and Construction Contract signed by GBI obligated GBI to provide construction financing for the Residence Inn project. (Misco's Motion at 3, ¶ 5; Misco Aff. ¶ 4; *see also* Nelson Aff. ¶ 4, and Ex. A.) Under the applicable standard of proof, the Court finds that Fertl could have obtained material confidential information.

As to the second prong, it is reasonable to infer that confidential information about the Partnership Agreement would have been given to Fertl during her representation of Misco. In fact, the record contains uncontroverted evidence that Fertl's advice was sought as to GBI's obligations under the agreement at issue here.[16] (Misco's Motion at 3, ¶ 5; Defendants' Brief at 2–3, ¶ 14.) Moreover, the record indicates that Fertl extensively advised Misco as to his performance under the Partnership Agreement. The substantial relationship test, we note, does not require Misco to divulge any confidences to prove that they were revealed to Fertl. *Novo Terapeutisk*, 607 F.2d at 195. On this evidence, the Court finds, it is reasonable to infer that confidential information would have been given to a lawyer in Fertl's former position as Misco's and/or the Partnership's attorney.

Third, the information obtained by Fertl is relevant to the issues raised in the pending litigation. A simple reading of the complaint makes this clear. Plaintiff Partners allege, for example, that they performed all of their obligations under the Partnership Agreement. (Second Amended Complaint at 2, ¶ 10.) Defendants allege as an affirmative defense, however, that the partners failed to perform obligations precedent to those of GBI, such as obtaining approvals from both the franchisor and the City of Brookfield, which were Misco's particular obligations under the Partnership Agreement. (Amended Answer and Affirmative Defenses of Green Builders, Inc. to Second Amended Complaint at 8, ¶¶ 8, 9; *see also* Second Amended Complaint, Ex. A.) The Court, therefore finds that Quarles' present representation and Fertl's former representation satisfy the three prongs of the substantial relationship test.

Because the two representations are substantially related, the presumptions of shared confidences arise. As Misco has moved the

resented the Partnership, it would be improper for her to later represent one or more of the partners in litigation among the partners. *See Prisco*, 799 F.Supp. at 270. Moreover, Defendants' arguments concerning whether Fertl actually obtained confidential information during her prior representation are inapposite. One of the issues herein is whether Fertl could have obtained confidential information, not whether she did, in fact, receive such information. Defendants' arguments, therefore, are made more appropriately to claims of attorney-client privilege during discovery.

**16.** Although Defendants argue that Misco waived the attorney-client privilege as to this piece of information when he revealed it to Nelson, Defendants do not dispute that Fertl had other information necessary to give this advice. (Defendants' Brief at 14.)

Court for imputed disqualification, the case falls within the exception provided in *Analytica*. Fertl left the Weiss firm and eventually joined Quarles, and Quarles now represents Defendants, adversaries of one of Fertl's former clients. As such, the presumptions are rebuttable. *Analytica*, 708 F.2d at 1267.

Defendants have not rebutted the presumption that Fertl was privy to confidential information during her prior representation. They offer no affidavit from Fertl, the Court notes, stating that she did not receive confidential information. Defendants incorrectly assert, moreover, that Misco has the burden of proving that Fertl received confidential information. (Defendants' Brief at 14.) Finally, Fertl's advice to Misco that GBI was obligated to provide construction financing for the Residence Inn project under the Partnership Agreement and Construction Contract suggests that Fertl was, in fact, privy to confidential information. (See Misco Aff. ¶ 4.)

It would thus be proper for the Court to disqualify Fertl based on Defendants' failure to rebut the presumption of shared confidences during her former representation. The issue here, however, is not whether to disqualify Fertl,[17] but rather, whether to impute Fertl's conflict of interest to Quarles. To avoid the firm's disqualification, Quarles must rebut the presumption of intra-firm sharing of confidences as to her former representation.

In this, Defendants have also failed. Quarles did make arrangements, the Court notes, to screen Fertl from the present litigation on March 13, 1992, by denying her access to all files containing GBI materials, restricting her access to any information kept on an electronic database, and banning all discussion of the case with her. (Wallenfang Aff. ¶¶ 16, 17, & Ex. N.) The Court may also infer some insulation of Fertl from the firm's size—185 lawyers in Milwaukee. There, Fertl and Wallenfang, the lawyer representing Defendants, work on different floors and in different departments. (Wallenfang Aff. ¶¶ 2, 3.)

Although Quarles employed a screen, it was untimely. Screens must be in place when the potentially disqualifying event occurs, *see LaSalle Nat'l Bank*, 703 F.2d at 259, in this case before March 13, 1992. On April 9, 1990, we note, Fertl's name was mentioned at a deposition taken for the present matter and attended by Wallenfang. (Misco's Motion at 9; Wallenfang Aff. ¶ 18.) Fertl's name was also mentioned at a deposition taken January 14, 1991, where Wallenfang was again present. (Wallenfang Aff. ¶ 19.) Misco asserts that Wallenfang reviewed letters and documents signed by Fertl on or before December 1989. (Misco's Motion at 9.) The Court finds, therefore, that Quarles should have been aware of a potential conflict of interest in its representation of Defendants before March 13, 1992. That Wallenfang had not met Fertl before this year, or was not made aware of her association with Quarles, is no excuse. The rules of disqualification that apply to large law firms, where familiarity with one's peers may regrettably no longer be commonplace, are no different than those that apply to all other firms. *Kerr–McGee*, 580 F.2d at 1321. The Court finds, therefore, that Defendants have not rebutted the presumption of intra-firm sharing because Quarles failed to screen Fertl when they should have been aware of her conflict.

Defendants have failed to meet the strict standard of proof that applies to evidence offered to rebut the two presumptions of shared confidences. *Freeman*, 689 F.2d at 723. Furthermore, there is no evidence that Misco has filed the motion as a litigation tactic. Misco's attorney contacted Quarles when Misco became aware of Fertl's employment with Quarles, and filed this motion soon thereafter. Quarles refused to voluntarily withdraw. (Misco's Motion at 5, ¶ 14; Misco Aff. ¶ 5.) The Court recognizes, of course, that disqualification may impose some hardship upon Defendants due to the amount of discovery that has already been conducted.

17. Defendants maintain that Fertl is not, and never was, involved in Quarles' representation of them. (Defendants' Brief at 4.)

Defendants have not, however, provided the type of clear and effective proof required to rebut the presumptions of shared confidences. Given that the Court must resolve any doubt as to the existence of an alleged conflict of interest in favor of disqualification, *LaSalle Nat'l Bank,* 703 F.2d at 257, Misco must therefore prevail.

## V. CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** Misco's motion to disqualify Quarles & Brady be **GRANTED.** Defendants are directed to notify the Court as to their retention of new counsel within thirty (30) days.

**SO ORDERED.**