2005 VT 116

# Robert and Janice Cody and Cody Chevrolet, Inc. v. William P. Cody

[889 A.2d 733]

No. 05-171

Present: Reiber, C.J., Dooley and Skoglund, JJ., and Crawford, Supr. J., Specially Assigned

Opinion Filed October 7, 2005

*Robert B. Hemley* and *Andrew D. Manitsky* of *Gravel and Shea*, Burlington, for Petitioners.

*Michael L. Burak* and *W. Scott Fewell* of *Burak Anderson & Melloni, PLC*, Burlington, for Respondent.

¶ 1. **Reiber, C.J.** In this extraordinary relief action, we consider whether the trial court erred in granting plaintiff William Cody's motion to disqualify Gravel & Shea from representing defendants Robert Cody, Janice Cody, and Cody Chevrolet, Inc. in a lawsuit that he filed against them. The trial court granted the motion after concluding that William had an objectively reasonable belief that Gravel & Shea had represented him personally while he worked at Cody Chevrolet. The court presumed that William had divulged confidential information to Gravel & Shea in the course of such representation, and it therefore found a conflict of interest in Gravel & Shea's continued representation of defendants. Defendants argue that the trial court abused its discretion in granting the motion because it ignored key facts, and it failed to hold an evidentiary hearing to resolve disputes of material fact. We agree, and therefore vacate the court's decision. Within thirty days of the date of this Court's order, the trial court must hold an evidentiary hearing on the motion and make findings of fact in deciding whether the motion should be granted.

¶ 2. We begin with the events that gave rise to this action. William sued defendants in September 2004, alleging in part that his parents, Robert and Janice Cody, had reneged on a promise to give him control of Cody Chevrolet after their deaths. In December 2004, William filed a motion to disqualify Gravel & Shea from representing defendants. William stated that he considered Gravel & Shea to have been his personal attorneys since at least 1994, and because he was a former client, the firm was ethically prohibited from taking a position adverse to his interests. Defendants opposed the motion, asserting that Gravel & Shea had never represented William. The trial court granted the motion in April 2005, without holding a hearing, after finding that no material dispute of fact existed that would require the taking of testimony.

¶ 3. In reaching its conclusion, the court relied on the following facts, which it derived from affidavits provided by William and attorneys Charles Shea and William Post. Gravel & Shea began representing parents in 1985 primarily for estate planning purposes. The firm also represented Cody Chevrolet at times, although the scope and duration of the corporate representation was unclear from the record. In 1985,

Gravel & Shea drafted a stock purchase agreement for parents to allow William and his brother Robert, Jr. to obtain ownership and control of Cody Chevrolet before or upon parents' deaths. Under the agreement, parents could make gifts of stock to brothers, and brothers would be required to transfer funds to parents' estate upon parents' death.

¶ 4. Robert, Sr. later sought to begin gifting stock, and on attorney Shea's advice, the gifting of stock was conditioned on certain stock transfer agreements between Cody Chevrolet and brothers. Shea drafted the agreements, which William and Robert, Jr. signed in 1994. Shortly thereafter, Robert, Jr. was terminated from the corporation. He signed amendments to the 1985 and 1994 agreements to reflect his changed status. William, who was general manager of the corporation at the time, signed the amendments on behalf of Cody Chevrolet. Robert, Sr. decided not to have another person assume Robert, Jr.'s role under the 1985 agreement.

¶ 5. William later became concerned about his rights under the 1985 agreement, fearing that several family members were opposed to his acquisition of controlling ownership of the corporation. In May 1996, William contacted attorney Shea and requested a meeting. At the meeting, which was billed to the corporation, William asked Shea about the status of stock gifts from his parents. William averred that he and Shea discussed the various stock purchase agreements in some detail. He stated that, although he did not quite understand Shea's explanation, Shea told him that it would be okay, and that there was nothing else that William needed to do to protect his interests. According to William, Shea advised him that if Robert, Jr. ever returned to the corporation, Shea would make sure that documents were drawn up to protect William and the corporation. William stated that he was comforted by Shea's advice and felt no need to seek another attorney to protect his interests.

¶ 6. Shea acknowledged that the meeting occurred but disagreed with William's side of the story. Shea asserted that while he might have informed William what the stock purchase agreement provided, he would not have informed William that there was "nothing else he needed to do to protect his interests." Shea stated that he would not have reviewed the documents from William's point of view because he was not representing William and he was not retained to protect his interests.

¶ 7. The following year, according to William, Robert Jr. was reemployed by Cody Chevrolet, and William again became concerned about his future ownership rights. William contacted attorney Post, and Post

reassured him that he did not need to do anything to protect his interests. An agreement was later reached whereby William would receive fifty-five percent of the stock up front and Robert, Jr. would receive forty-five percent over time. Attorney Post was to handle the arrangements, including the transfer of stock. Later, after a dispute with Robert, Jr. over the nature of their respective rights, William claimed that he contacted attorney Post again to inquire about his rights. He alleged that Post had reassured him that with fifty-five percent of the corporation's stock, he would control the corporation's affairs.

¶ 8. In his affidavit, Post disagreed with William's story. Post acknowledged having several brief conversations with William regarding various aspects of stock transfers proposed by parents. He stated, however, that these conversations had been in the nature of imparting specific information to William regarding the status of the transfers and they did not involve administering legal advice. Post also stated that on several occasions he had informed William, and William had acknowledged, that parents were the firm's clients, and therefore Post could not get specific with William regarding anything that parents were doing.

¶ 9. William then contacted another attorney (not affiliated with Gravel & Shea), who at the time regularly represented the corporation. He inquired about the implications of owning fifty-five percent of the corporation stock. The attorney declined to advise William, and informed him that he should seek his own attorney because he was requesting personal legal advice. William apparently did so. The agreement regarding stock transfers evidently fell through, giving rise to the underlying litigation.

¶ 10. Based on these contested facts, and without holding a hearing, the court in its order considered the question of whether an attorney-client relationship had developed between William and Gravel & Shea. To answer this question, it analyzed whether William, a nonlawyer, believed that Gravel & Shea represented his personal interests, and whether that belief, in the totality of the circumstances, was objectively reasonable. The court accepted William's impressions and found the personal beliefs of attorneys Shea and Post irrelevant to its inquiry.

¶ 11. The court stated that Gravel & Shea's long history of corporate and family representation had created ambiguity as to whom the firm represented. It explained that the recurring issues for the firm related to ownership and control of the corporation as it passed from one generation to the next, and the representation intermingled corporate

and family issues. Within this context, the court found the 1996 meeting between William and Shea significant. It explained that William, who was worried about a family cabal, had asked Shea about the security of his right to become the controlling shareholder. The court found that, at minimum, Shea had answered the question by reading from the pertinent documents. The court indicated that it would be naive to believe that Shea limited his response to merely reading from the document, but stated that it was unnecessary to draw such an obvious inference from undisputed facts.

¶ 12. The court also found Post's affidavit vague, explaining that the affidavit did not indicate that Post had advised William that he did not represent him or that William should retain his own attorney. The court also concluded that the affidavit reflected William's belief that Gravel & Shea represented the Cody family, not just parents. Finally, the court found it noteworthy that William's conversation with Post had occurred after the vast majority of William's other contacts with attorneys Shea and Post.

¶ 13. The court found the ambiguity of the situation worsened by the longstanding lack of shared interests among family members and stockholders in the corporation. It explained that William had always wanted control of the corporation, and that family disagreements threatened that outcome for a protracted period and eventually prevented it. William had approached Gravel & Shea several times about his concerns, and he had never been explicitly advised that the firm did not represent him personally. The court reasoned that, under such circumstances, Gravel & Shea was obligated to clarify the nature of its representation, and it failed to do so. The court found that William had offered unrebutted evidence that he subjectively believed that Gravel & Shea represented him personally, and it concluded that this belief was objectively reasonable.

¶ 14. After finding that the prior representation involved the same subject matter as the current litigation, the court presumed that William had divulged confidential information to Gravel & Shea. It therefore found a conflict of interest in Gravel & Shea's continued representation of defendants, and it granted William's motion to disqualify. Defendants filed a petition for extraordinary relief pursuant to V.R.A.P. 21, and the Court accepted the petition in June 2005.

¶ 15. Defendants assert that the trial court erred in concluding that William was a client of Gravel & Shea. They argue that, instead of analyzing the totality of the circumstances, the court improperly focused on a few facts and ignored contrary information. According to

defendants, the court should have held a hearing to assess the credibility of William's assertions and resolve disputed questions of fact.

¶ 16. We review the trial court's decision for abuse of discretion. *Stowell v. Bennett*, 169 Vt. 630, 631, 739 A.2d 1210, 1211 (1999) (mem.). In reaching a decision on a disqualification motion, a court must be "solicitous of a client's right freely to choose his counsel" and "mindful of the fact that a client whose attorney is disqualified may suffer the loss of time and money in finding new counsel, and lose the benefit of counsel's familiarity with the case." *Id.* at 632, 739 A.2d at 1212 (quotations omitted); see also *First Hawaiian Bank v. Russell & Volkening, Inc.*, 861 F. Supp. 233, 237 (S.D.N.Y. 1994) (explaining that motions to disqualify are disfavored, and stating that "although doubts should be resolved in favor of disqualification, the party seeking disqualification must carry a heavy burden, and must meet a high standard of proof before a lawyer is disqualified") (quotation omitted); *Nelson v. Green Builders, Inc.*, 823 F. Supp. 1439, 1444 (E.D. Wis. 1993) (stating that motions to disqualify counsel "should be resolved with extreme caution because they may be used abusively as a litigation tactic"). As discussed below, we conclude that the court abused its discretion in granting the motion to disqualify because it ignored relevant facts and failed to hold an evidentiary hearing to resolve material factual disputes.

¶ 17. Although the trial court did not identify a particular ethics rule on which its decision was based, it presumably relied on Rule 1.9(a) of the Vermont Rules of Professional Conduct. Rule 1.9(a) provides that "[a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation." The rule is designed to "ensure that a lawyer does not use confidential information acquired from a former client against that client and to avoid even an appearance of impropriety." *In re Gadbois*, 173 Vt. 59, 63, 786 A.2d 393, 397 (2001).

¶ 18. We have not previously addressed when an individual becomes a "client" for purposes of the rule. Other courts, however, have recognized that the inquiry is fact specific. See, e.g., *Bieter Co. v. Blomquist*, 132 F.R.D. 220, 224 (D. Minn. 1990) ("Disqualification questions are intensely fact specific, and it is essential that the court

approach such questions with a keen sense of practicality as well as a precise picture of the underlying facts.") (quotation omitted); *Meyer v. Mulligan*, 889 P.2d 509, 513-14 (Wyo. 1995) ("The determination of whether there is an attorney-client relationship is one of fact and, typically, is for the trier of fact and cannot be resolved by summary judgment."); see also V.R.P.C., Scope ("Whether a client-lawyer relationship exists for any specific purpose can depend on the circumstances and may be a question of fact.").

¶ 19. Some courts hold that "[a]n attorney-client relationship is formed when an attorney renders advice directly to a client who has consulted him seeking legal counsel." *Waggoner v. Snow, Becker, Kroll, Klaris & Krauss*, 991 F.2d 1501, 1505 (9th Cir. 1993) (identifying standard employed under New York and California law). In a similar vein, the United States Court of Appeals for the Tenth Circuit has held that to establish the existence of an attorney-client relationship, subjecting a lawyer to the ethical obligation of preserving confidential communications, "a party must show that (1) it submitted confidential information to a lawyer and (2) it did so with the reasonable belief that the lawyer was acting as the party's attorney." *Cole v. Ruidoso Mun. Sch.*, 43 F.3d 1373, 1384 (10th Cir. 1994) (citing *Nelson*, 823 F. Supp. at 1445); *Meyer*, 889 P.2d at 513 ("[T]he existence of an attorney-client relationship . . . may be implied from the conduct of the parties, such as the giving of advice or assistance, or such as failing to negate the relationship when the advice or assistance is sought if the attorney is aware of the reliance on the relationship.") (quotation omitted). It follows that the intent and conduct of the parties are relevant considerations in determining if an attorney-client relationship exists. See *Waggoner*, 991 F.2d at 1505 ("The court may look to the intent and conduct of the parties to determine whether the relationship was actually formed."); see also *Cole*, 43 F.3d at 1384 (explaining that although a court may consider alleged former client's subjective belief, such a belief is not sufficient to establish an attorney-client relationship; the subjective belief must be reasonable); and compare *Westinghouse Elec. Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311, 1319, 1319 n.14 (7th Cir. 1978) (stating that existence of professional relationship for purposes of privileged attorney-client communications hinges on client's belief that he is consulting a lawyer in that capacity and his manifested intention to seek professional legal advice, and noting that "deciding factor" is what prospective client thought when making the disclosure, not what attorney thought).

¶ 20. Specific factors that other courts have employed in determining whether an attorney-client relationship exists include:

> 1) whether a fee arrangement was entered into or a fee paid; 2) whether a written contract or retainer agreement exists indicating that the attorney accepted representation; 3) whether there was an informal relationship whereby the attorney performed legal services gratuitously; 4) whether the attorney actually represented the individual in one aspect of the matter (e.g., at a deposition); 5) whether the attorney excluded the individual from some aspect of a litigation in order to protect another (or a) client's interest; 6) whether the purported client believes that the attorney was representing him and whether this belief is reasonable.

*First Hawaiian Bank*, 861 F. Supp. at 238 (citing cases).

¶ 21. In this case, the trial court assessed the objective reasonableness of William's asserted belief that Gravel & Shea began representing him in 1994. While the court employed an appropriate test, it abused its discretion in concluding that the facts necessary to resolve this question were undisputed. The resolution of this question required fact-finding by the court.

¶ 22. In granting the motion, the court drew unwarranted inferences from the materials provided by Gravel & Shea and it ignored contrary facts. For example, Post averred that he had specifically informed William, and William had acknowledged, that the firm's clients were parents. The trial court found this statement "vague," and concluded that Post had never specifically informed William that William was not his client. Assuming that the attorneys were indeed obligated to clarify who they represented, the court unreasonably concluded that it was undisputed that Post had failed to do so.

¶ 23. The court also characterized William's subjective belief that Gravel & Shea represented him as "unrebutted." In so finding, the court ignored a letter that William wrote in February 2003 stating that Gravel & Shea had provided legal services to a number of the corporation's shareholders other than himself. Moreover, while the court concluded that William had an objectively reasonable belief that Gravel & Shea had represented him, it failed to make any findings as to when such representation began or what it entailed. The court similarly failed to identify any specific legal advice that was requested or provided by attorneys Shea and Post, nor did it identify any confidential information that William provided to the attorneys. This omission

is significant, given the underlying purpose of the disqualification rule. See, e.g., *Chem. Waste Mgmt., Inc. v. Sims*, 875 F. Supp. 501, 503 (N.D. Ill. 1995) (recognizing that fundamental principle in lawyer-client relationship is that lawyer will maintain confidentiality of information relating to representation, and courts must safeguard sacrosanct privacy of attorney-client relationship so as to maintain public confidence in legal profession and protect integrity of judicial proceeding). As the *Sims* court explained, disqualification of counsel is only one of several avenues available to a court in its exercise of this duty, and it "is a drastic measure which courts should hesitate to impose except when absolutely necessary." *Id.* (quotation omitted).

¶ 24. In this case, William claimed that Post and Shea had "reassured him" that his rights were protected. Shea and Post averred that, at most, they informed William what the stock purchase agreements provided, and apprised him of the status of stock transfers. Accepting the assertions by Shea and Post, the attorneys' actions could be considered consistent with their representation of parents rather than acts that created an implied attorney-client relationship with William. See *M.J. Woods, Inc. v. Conopco, Inc.*, 271 F. Supp. 2d 576, 585 (S.D.N.Y. 2003) ("The simple act of an attorney giving advice to an individual does not automatically create an attorney-client relationship."). Additionally, while the court found that confusion and ambiguity had resulted from Gravel & Shea's longstanding representation of parents and the corporation, its longstanding representation could also be seen as evidence that William, an experienced businessperson, held an unreasonable belief that Gravel & Shea represented him personally. In any event, it is plain from the parties' affidavits that the facts necessary to resolve the question of whether an attorney-client relationship existed were in dispute, and that an evidentiary hearing was required. The trial court therefore abused its discretion in granting the motion.

¶ 25. Because we conclude that the undisputed facts do not show that an attorney-client relationship existed between William and Gravel & Shea, we do not address whether the trial court erred in presuming that William divulged confidential information to the attorneys.

*The trial court's order disqualifying Gravel & Shea from representing defendants is vacated, and the court is ordered to hold an evidentiary hearing on the motion within thirty days of the date of this order to resolve disputed questions of fact.*